Jon W. WOJCIECHOWSKI, d/b/a Jon's Freeway Standard, Plaintiff,

v.

AMOCO OIL COMPANY, a Maryland Corporation, Defendant.

No. 79-C-1054.

United States District Court,
E. D. Wisconsin.

Jan. 11, 1980.

Arthur J. Harrington, Charne, Glassner, Tehan, Clancy & Taitelman, Milwaukee, Wis., for plaintiff.

W. Stuart Parsons and M. Jeffrey Morris, Quarles & Brady, Milwaukee, Wis., for defendant.

## MEMORANDUM AND ORDER

WARREN, District Judge.

Plaintiff is a gasoline service station franchisee who entered into a franchise which commenced on January 3, 1979 and, by its terms, expired on December 31, 1979. On September 6, 1979, defendant advised plaintiff, by certified mail, that defendant would not renew the lease beyond the December 31, 1979 expiration date. By this action, plaintiff seeks to enjoin defendant from, in effect, terminating the franchise. A hearing was held on plaintiff's motion for a preliminary injunction and the following constitutes the Court's findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

During 1978, plaintiff was employed at an Amoco station owned by Richard Manske and located in East Troy, Wisconsin. As Manske's employee and as an employee for another franchisee at the East Troy station, plaintiff gained a great deal of experience in operating an Amoco station.

In November of 1978, plaintiff made arrangements to purchase Manske's station. He entered into an agreement with Manske to buy the right, title and interest to the station, including inventory, equipment and good will, for the sale price of $72,000.00. Plaintiff then obtained a loan commitment from the State Bank of East Troy in the amount of $72,000 for the purchase price and an additional $5,000 as working capital. The purchase agreement and loan commitments were contingent upon the agreement of defendant to accept plaintiff as a franchisee. Therefore, plaintiff met with John Beck, an employee of defendant, and they set up a meeting to discuss the possibility of plaintiff becoming a franchisee.

A meeting was held on December 15, 1978, at defendant's Brookfield, Wisconsin, office. Mr. Gordon Bond, a sales manager for Amoco, and Mr. John Beck, an Amoco sales representative, were present at this meeting in addition to plaintiff. The subject of plaintiff's franchise was discussed and, according to plaintiff, Mr. Bond advised him that, under Petroleum Marketing Practices Act (15 U.S.C. §§ 2801–2806), Amoco would have to treat plaintiff as a trial franchisee. Each person who attended this meeting testified concerning his recollection. Messrs. Bond and Beck testified that Bond told plaintiff that company policy required treatment of plaintiff as a trial franchisee, but plaintiff testified otherwise. The Court finds that plaintiff was told by Mr. Bond that the law required Amoco to grant plaintiff only a trial franchise.

Plaintiff objected to being treated as a trial franchisee with its one year term. Nevertheless, he agreed to this term, but only after discussing another matter at the December 15, 1978 meeting. Mr. Bond presented plaintiff with a method for increasing sales volumes and maximizing profits on the sale of gasoline types. This method of marketing gasoline involves the adjustments of the margins between the purchase price to the retailer and the retail price to the consumer of several of the grades of gasoline sold by a station. By shifting the margins of various items, some up in price and some down, volumes could conceivably be increased. Plaintiff was given a sheet setting forth examples of how the several margins could be adjusted to obtain the desired results. Such a change in several margins was referred to by Bond as a change in the pool margin.

Plaintiff agreed to try the method and, thereafter, Mr. Bond indicated that plaintiff would receive a "trial franchise." Bond never advised plaintiff of what price to charge or margin to set, however, and plaintiff never agreed to any set amount.

On January 3, 1979, plaintiff purchased Mr. Manske's business and commenced business. The purchase was made on January 3, 1979 prior to the date that plaintiff entered into the franchise agreement which occurred on January 8, 1979. On this date, Mr. Beck delivered the contracts, which plaintiff had never seen before, to be signed by plaintiff. Mr. Beck was asked what would happen if plaintiff would not agree to the "trial franchise" arrangement. Plaintiff was advised that in such a case he would not be granted a franchise. Thus, plaintiff signed the agreements on January 8, 1979.

Plaintiff used the pool margin method of marketing gasoline for approximately six weeks but eventually abandoned this mode of pricing for the conventional method of inflexible margins. Upon a visit to the station in March of 1979, Mr. Bond noted that plaintiff was not using the pool margin method and indicated that he was upset with plaintiff for not using the mode of pricing. Plaintiff responded that he was an independent businessman who could set his own prices.

In addition to commenting about pricing, Mr. Bond noted that junk cars were on the premises. Apparently, the junk automobile problem was alleviated by April, since plaintiff received an extremely high rating for cleanliness in a report prepared by Mr. Beck on April 24, 1979. (Plaintiff's Ex. 8).

Although not expressed to plaintiff, defendant had several other problems with plaintiff's station. He sold an insufficient volume of gasoline which made defendant's return on investment inadequate. In addition, on one occasion employees of defendant observed a car for sale on the station premises. Furthermore, Mr. Beck reported that plaintiff's employees were not neat and clean.

The notice of nonrenewal sent to plaintiff by certified mail on September 6, 1979, mentioned no reason for the noncontinuation of plaintiff's franchise. After receiving the notice, plaintiff pressed Mr. Beck for a reason and plaintiff was told that it was poor sales volume. While this was a factor in defendant's decision, the other deficiencies noted above also played a part in defendant's actions.

In light of the above facts, the question facing this Court is whether plaintiff is entitled to a preliminary injunction. In order to grant a preliminary injunction, a court must determine whether the moving party has met its burden of persuasion on four prerequisites. These requirements are that: (1) the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (2) the threatened injury to the plaintiff outweighs the threatened injury the injunction may inflict on the defendant; (3) the plaintiff has at least a reasonable likelihood of success on the merits; and (4) the granting of a temporary restraining order will not disserve the public interest. *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products*, 545 F.2d 1096 (7th Cir. 1976).

## I. *ADEQUATE REMEDY AT LAW*

The law is very clear that the loss of a franchise is an irreparable harm, *see Stenberg v. Checker Oil Co.*, 573 F.2d 921 (6th Cir. 1978); *Milsen Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971), and thus legal remedies are inadequate. Nothing further need be said on this point.

## II. *BALANCE OF HARMS & PUBLIC INTEREST*

There is no question whatsoever that the potential harm to plaintiff if he loses the franchise far outweighs that which defendant may suffer if it is forced to permit plaintiff to continue. Therefore, the balance of harm favors plaintiff. Furthermore, the public interest is served by preserving a business which, if abandoned, may result in plaintiff's bankruptcy.

## III. *LIKELIHOOD OF SUCCESS*

The contract between plaintiff and defendant was written to conform with section 2803(b)(1) of the Petroleum Marketing Practices Act (PMPA). 15 U.S.C. §§ 2801–2806. If a franchisor properly complies with this portion of the PMPA and the

proposed franchisee fits the description set forth in the statute, the franchise granted is a "trial franchise." In failing to renew a "trial franchise," the franchisor need not comply with the notice of deficiency and opportunity to cure provisions set forth in 15 U.S.C. § 2802. Instead, "the franchisor may fail to renew the franchise relationship at the conclusion of the initial term stated in the franchise by notifying the franchisee, in accordance with the provisions of [15 U.S.C. § 2804], of the franchisor's intention not to renew the franchise relationship." 15 U.S.C. § 2803(b)(1)(D)(iii). As indicated earlier, defendant sent a notice to plaintiff on September 6, 1979.

The requirements for proper notice are set out in section 2804(c) which provides that the:

(c) Notification under this section—

    (1) shall be in writing;

    (2) shall be posted by certified mail or personally delivered to the franchisee; and

    (3) shall contain—

    (A) a statement of intention to terminate the franchise or not to renew the franchise relationship, *together with the reasons therefor;*

    (B) the date on which such termination or nonrenewal takes effect; and

    (C) the summary statement prepared under subsection (d).

Subsection 2804(d) further provides:

(d)(1) Not later than 30 days after the date of enactment of this Act [enacted June 19, 1978], the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this title, including a statement of the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this title.

(2) In the case of summaries required to be furnished under the provisions of section 102(b)(2)(D) [15 USCS § 2802(b)(2)(D)] or subsection (c)(3)(C) of this section before the date of publication of such summary in the Federal Register, such summary may be fur-nished not later than 5 days after it is so published rather than at the time required under such provisions.

Ordinarily, the notice must be sent "not less than 90 days prior to the date on, which . . . nonrenewal takes effect." 15 U.S.C. § 2804(a)(2). In examining the notice sent by defendant, the Court finds that it was timely but defective, because the reasons for termination were not given. Therefore, defendant has violated section 2803(b) because, as indicated earlier, that section requires proper notice in order for the franchisor to exercise his right to not renew a "trial franchise."

Having found that defendant failed to comply with nonrenewal requirements of section 2803, the Court would note that it can grant equitable relief for defendant's failure to comply. 15 U.S.C. § 2805(b). Interestingly, section 2804 does not contain any requirements for the type of reason to be set forth in the notice of nonrenewal. In examining the statute, the Court finds that if it were to require a franchisor to give a substantial reason, the Court would be embossing the "trial franchise" nonrenewal provisions with a good cause provision not intended by Congress. Fortunately, this issue need not be reached since defendant failed to meet the technical prerequisites of section 2804(c)(3)(A). Such a failure is sufficient under the PMPA, in this Court's opinion, to entitle plaintiff to equitable relief.

Defendant's violation of section 2803(b)(1) permits utilization of the relief provided under section 2805(b)(2). This subsection provides:

(2) Except as provided in paragraph (3), in any action under subsection (a), the court shall grant a preliminary injunction if—

    (A) the franchisee shows—

    (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

    (ii) there exist sufficiently serious questions going to the merits to make

such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

The violation of section 2804 is so blatant that under the relaxed showing of "serious questions going to the merits . . .," plaintiff has clearly shown entitlement to injunctive relief.

Relying upon the equitable powers granted in 15 U.S.C. § 2805(b)(1), the Court will order defendant to continue plaintiff's franchise. In effect, the Court is depriving defendant of the right to treat plaintiff as a "trial franchise." Therefore, defendant must comply with the requirements of 15 U.S.C. § 2802 before the nonrenewal can take effect. In order to preserve the rights of plaintiff and those of defendant, the Court will order continuation of the franchise on a month-to-month basis. At any time defendant desires to obtain the right to not renew and if cause as defined in section 2802 exists, then defendant may petition the Court for an immediate hearing to have the injunction lifted. During the interim, all efforts will be made to set this matter on for an early trial.

In so holding, the Court recognizes that defendant has lost its right to rely on the "trial franchise" agreements because of a mere technical violation. In reaching this result, the Court has considered another ground which further indicates that the relief accorded is justified.

Plaintiff claims that, at the December 15, 1978 meeting, Mr. Bond made certain misrepresentations which lead plaintiff to enter into the "trial franchise." The evidence shows that Bond told plaintiff that the law required defendant to treat plaintiff as a "trial franchise." Plaintiff was displeased with such treatment and to mollify him, Bond advised plaintiff that the franchise would be renewed if plaintiff performed

adequately. Upon such representations, plaintiff signed the agreement which on its face created a "trial franchise."

The evidence of exactly what Mr. Bond told plaintiff at the December 15, 1978 meeting is conflicting. Apparently, Bond and Beck deny that plaintiff was told the law required granting plaintiff only a "trial franchise." Instead they claim this was company policy. At any rate, plaintiff was a more credible witness and, therefore, the Court finds that plaintiff was informed that the law required defendant to grant the limited "trial franchise."

Clearly, the PMPA does not require a franchisor to utilize the benefits of section 2803(b)(1). Furthermore, if a franchisor fails to comply with the requirements of section 2803(b)(1) it will grant a franchise which is not a "trial franchise." The result is that the franchisee enjoys the benefits accorded under section 2802(b)(2) and (3).

This Court finds that if a franchisor intentionally misleads a franchisee into signing a "trial franchise," the benefits of section 2803(b)(1) are lost and a "trial franchise" is not created. Looking towards Wisconsin law, since the contract was negotiated and formed in that state, the Court must determine whether defendant committed fraud when it made certain representations to plaintiff.

There were two misrepresentations made by defendant. The first, that the PMPA required defendant to treat plaintiff as a trial franchisee, was a misrepresentation of law. The second was a misrepresentation of fact, i. e., that plaintiff would be renewed if his performance was adequate. The question presented by such misrepresentations is whether these constitute fraud.

As a general rule in Wisconsin, fraud cannot be based upon misrepresentations of law. *Bentley v. Fayas*, 260 Wis. 177, 184, 50 N.W.2d 404 (1951). This rule is not absolute as was indicated by the Wisconsin Supreme Court's opinion in *Rusch v. Wald*, 202 Wis. 462, 232 N.W. 875 (1930). There the court held that a party who en-

tered into a contract based upon misrepresentations of law has a cause of action for damages or rescission as long as the plaintiff acted with prudence and diligence, the defendant mislead or deceived the plaintiff, there was trust reposed on defendant, and superior skill and knowledge resided on the other side. In the present case, defendant had such superior experience, trust was reposed on defendant by plaintiff, and, most significantly, the evidence indicates that defendant intentionally mislead plaintiff. Therefore, the defendant committed fraud in misrepresenting the law.

■■ The second representation was a statement as to what action defendant would take in the future. Ordinarily, fraud cannot be predicated upon statements or representations of things to be done in the future. 37 Am.Jur.2d *Fraud* § 57 (1968). However, if Amoco had a present intention not to continue the franchise even if the performance was adequate, then this would constitute actionable fraud. *Id.* at § 59. Although the evidence in the present case is quite sparse on the issue of defendant's intention at the time its employees indicated that plaintiff would be continued if his performance was adequate, there is sufficient proof at this juncture in the litigation to show that defendant misrepresented its intention.

■ The two actionable misrepresentations, when coupled together, are sufficient acts of fraud to deprive defendant of the benefits of 15 U.S.C. § 2803(b)(1). Therefore, defendant will not be permitted to let the franchise end. Instead, defendant must comply with the requirements of 15 U.S.C. § 2802 before it can fail to renew. Defendant will thus be enjoined from ending its franchise relationship with plaintiff and must continue the relationship on a month-to-month basis as long as plaintiff performs adequately.

In addition to the grounds relied upon by the Court, plaintiff cites other legal grounds supporting his request for a preliminary injunction. He first claims that the doctrine of promissory estoppel entitles him to relief. In addition, plaintiff argues that the franchise was not on a trial basis because he succeeded to unexpired portion of another franchise. Finally, plaintiff relies upon a claim of price fixing in violation of the section 1 of the Sherman Antitrust Act.

■ Plaintiff's promissory estoppel claim is based upon the promise that defendant would continue the franchise if plaintiff's performance was adequate. The doctrine, although it has been adopted in Wisconsin, *see Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965), provides no help to plaintiff's claim. The oral promises here were made prior to the written contract. Therefore, the parol evidence rule nullifies the salutory effects of the doctrine of promissory estoppel. Plaintiff relies heavily upon the Wisconsin Supreme Court's opinion in *McConnell v. L. C. L. Transit Co.*, 42 Wis.2d 429, 167 N.W.2d 226 (1969). There the court held that, under the doctrine of promissory estoppel, promises made after a written contract was entered and which were relied upon by the promisee, can vary the terms of a written contract. While in *McConnell* certain of the oral promises were made prior to formation of the written contract, the court held that it need not determine "whether the making of a contract after a person relies on an oral promise prevents said person from raising a promissory estoppel argument." *Id.* at 437, 167 N.W.2d at 229. Thus, this case is of little help to plaintiff.

■ Turning to the next argument which is based upon 15 U.S.C. § 2803(b)(2) which provides that " 'trial franchise' does not include the unexpired portion of a franchise," the Court concludes that plaintiff's reliance is factually misplaced. Plaintiff did not succeed to the unexpired portion of Manske's franchise. Instead, plaintiff acquired a new franchise after Manske released his to defendant. Therefore, defendant could have granted on a trial franchise if it had not otherwise acted to lose its rights under section 2803(b)(1).

■ Finally, plaintiff points to the pool margin method of pricing urged upon him by Mr. Bond, arguing that this was a viola-

tion of section 1 of the Sherman Antitrust Act. Even if this was a violation, something that will not be decided at this time, the Court does not see how that would support plaintiff's request for a preliminary injunction. If plaintiff is within the ambit of the PMPA, then defendant's violation of the requirements of that act accord plaintiff the rights needed. Damages may flow and cancellation for plaintiff's failure to comply may be an unrecognized reason for nonrenewal, but plaintiff's rights and defendant's duties lie under the Act. Thus, the failure to use the pool margin method, if anything, could constitute an inadequate ground for failure to renew if its use by plaintiff would violate the Sherman Act. If, on the other hand, plaintiff's agreement is outside the full protection of PMPA, i. e., by being a "trial franchisee," then a violation of the Sherman Act would not help plaintiff anyway, since all defendant need do is give notice as defined in section 2804(c). Defendant's failure to comply with the notice requirements of section 2804(c), even if plaintiff is a "trial franchisee," is a violation and a preliminary finding of a Sherman Act violation would add little to the case.

In summary, plaintiff's motion for a preliminary injunction is granted, provided plaintiff posts a bond in the sum of $25,000 by January 16, 1980. Therefore, it is hereby ordered:

(1) the defendant shall refrain from interfering with, altering, or discontinuing in any way the normal and usual business arrangements which plaintiff has heretofore enjoyed with the defendant, unless and until defendant has good cause as set forth in 15 U.S.C. § 2802(b)(2) and (3), has complied with the requirements of those subsections and seeks leave of the Court to end the relationship or until the Court holds a trial on the merits and enters a final order;

(2) plaintiff must secure a bond in the sum of $25,000.00 and post this with the Clerk of Courts for the United States District Court for the Eastern District of Wisconsin by January 16, 1980.