Luis ESCOBAR, d/b/a Tropical
Service Center

v.

MOBIL OIL CORPORATION.

Civ. No. B–80–513.

United States District Court,
D. Connecticut.

Sept. 17, 1981.

Thor L. Crone, Abate, Fox & Farrell, Stamford, Conn., for plaintiff.

John Crosskey, Kenneth W. Ritt, Day, Berry & Howard, Stamford, Conn., for defendant.

## MEMORANDUM OF DECISION

ELLEN B. BURNS, District Judge.

This is an action commenced in Connecticut Superior Court on November 12, 1980, and removed to this Court by the defendant on November 21, 1980, pursuant to 28 U.S.C. § 1441. The complaint alleges that defendant breached certain common law duties owed plaintiff and violated several state and federal statutes, including the Petroleum Marketing Practices Act, Pub. L.No. 95–297, tit. I, 92 Stat. 322 (1978), *codified in* 15 U.S.C. §§ 2801–2806 (Supp. II 1978) (the Act). As relief, plaintiff seeks damages and a variety of equitable orders, including a preliminary injunction restraining defendant from terminating its business relationship with plaintiff, which is commonly known as a "franchise." *See* 15 U.S.C. § 2801(1)(A)–(1)(B). This Court held an evidentiary hearing on plaintiff's motion for a preliminary injunction and, because plaintiff has proved that defendant failed to comply with the notice provisions of the Act, the motion for a preliminary injunction is granted.

### I.

Plaintiff Luis Escobar operates a gasoline station in Norwalk, Connecticut. Since 1973, plaintiff and defendant Mobil Oil Corporation have been parties to a series of franchise agreements whereby plaintiff markets gasoline and other petroleum products under defendant's trademark.[1] Each of the franchise agreement packages includes a retail dealer contract, a service station lease, a security agreement and various riders and schedules, such as a "Mobil" trademark sign rental agreement.

Plaintiff and defendant executed one such franchise agreement on June 30, 1977. Both the lease and retail dealer contract had three-year terms which were to expire on February 28, 1980. Under the 1977 retail dealer contract, plaintiff agreed to purchase at least 148,575 gallons of gasoline, but not more than 297,149 gallons per year. According to the terms of the service station lease, plaintiff paid 2.25 cents for each gallon of gasoline delivered into his storage tanks, but not less than $350 per month.

The contract and the lease contain a number of other provisions. The lease, for example, allocates maintenance obligations between the parties. In pertinent part, paragraph 6 provides that "in order to contribute to the health, safety and comfort of the motoring public and to promote cleanliness and good appearance of the general community, ... [tenant agrees] to keep the premises in clean, orderly and well-lighted condition, free of trash, junk and debris, and ... to dispose of all wastes such as waste oil, used tires, batteries and other refuse...."

The supplemental agreement which is a part of the '77 franchise package included detailed standards for service station appearance. Paragraph I(g) provides that "[t]he drive areas will be kept clear of obstructions and cars will not be parked in areas other than those designated by Mobil for parking...." Paragraph I(h) provides that "[u]nregistered cars will not be re-

---

1. Plaintiff's station has two garage bays and four gasoline pumps. He repairs automobiles and has towed cars for AAA and the City of Norwalk.

tained on the station property for more than 48 hours."

Article 4(A) of the supplemental agreement recites that "[t]he duties and obligations set forth in [the package] are agreed by the parties to be material to the relationship between Mobil and Dealer." Failure to meet any obligation was also agreed to be an event of default which could trigger termination of the franchise. The testimony of Mobil marketing representative John McNally indicated that Mobil prepares the franchise packages.

On November 20, 1979, McNally visited plaintiff's service station. He brought with him at least one copy of a proposed franchise agreement package which was intended to cover the next three years. Plaintiff wanted to review the package and McNally, who did not want to leave the original documents with plaintiff, left a copy, requiring plaintiff to sign a receipt for it.

McNally returned to the station December 12, 1979, to discuss the renewal package. At this meeting, plaintiff expressed dissatisfaction with the terms of the renewal package, especially the rental price. McNally left the station, taking plaintiff's copy of the documents with him.

On January 2, 1980, McNally left the franchise renewal package with plaintiff once again. McNally also hand delivered a letter to plaintiff that day which extended the 1977 lease ninety days, to May 29, 1980. The letter related that the purpose of the extension was to afford time for negotiation of a new agreement. Plaintiff signed the ninety day letter "acknowledged and accepted" on January 10, 1980. The letter was signed for Mobil by E. W. Rucci, district manager.

On February 11, 1980, Mobil mailed plaintiff a letter stating that Mobil would not renew the 1977 lease, and terminating "said Lease and Contract effective May 29th, 1980." The letter gave plaintiff ninety days to make a decision on the outstanding lease proposal. Like the January 2 letter, this one was also signed by Rucci.

The proposed franchise renewal agreement included a higher monthly rental than the '77 agreement. The proposed rental increase was calculated in two parts. Under the agreement, the service station dealer was to pay 1.6 cents per delivered gallon of gasoline, but at least $384 per month. Added to this was a $700 monthly charge "for use of the non-motor fuel facilities," which was to be collected at 13.5 cents per delivered gallon. This $700 charge is called the alternate profit center, or APC, rent. The franchise agreement recites that the APC rent is calculated on historical use of the non-motor fuel facilities, such as automobile repair.

There were other differences in the terms of the renewal package. For example, paragraph 14 of the retail dealer contract, which had no counterpart in the 1977 contract, substantially restated the non-renewal and termination provisions of the Petroleum Marketing Practices Act, 15 U.S.C. § 2802(b)(1), (b)(2), (b)(3), which had become effective during the term of the '77 lease. See also 43 Fed.Reg. 38,743 (1978). The quantity of gasoline to be purchased under the retail dealer agreement reflected change in applicable laws and regulations. Paragraph 11 of the service station lease, like paragraph 14 of the retail dealer contract, limited the grounds for termination and non-renewal to those permissible under the Petroleum Marketing Practices Act.

While negotiations with Mobil continued during January, 1980, plaintiff was negotiating for the sale of his business with Dean Price of Wilton, Connecticut. Plaintiff agreed to sell the station to Price for $75,-000, but the sale was never concluded.

Mr. Price testified that he was quite interested in purchasing plaintiff's station and, to that end, had put down one per cent of the purchase price as a binder. Mr. Price met more than once with John McNally, with whom he discussed the planned sale. Mr. Price testified that Mr. McNally attempted to dissuade him from purchasing the station. According to Price, McNally said, "the station is not worth what you're paying" and made statements impugning

plaintiff's treatment of prior business associates and otherwise derogating plaintiff's character. Mr. McNally admitted telling Mr. Price that the sales price was too high, but added that this statement was made in the course of a conversation concerning allocation of gasoline; McNally testified that his complete statement had been, "the station is not worth what you intend to pay without an increase in allocation." Mr. McNally denied ever telling Mr. Price that plaintiff had treated business partners unfairly or that Mr. Price should wait a couple of months before acting on the planned sale, since Mobil intended to evict plaintiff, whom it considered a "headache." Mr. Price ultimately decided not to go through with the planned sale.

On March 20, 1980, Mr. McNally once again visited plaintiff's service station. According to plaintiff, McNally forced him to sign the various documents in the renewal package and refused to discuss the rental increase, saying that it could be gone over "later." Plaintiff also testified that McNally said, "If you don't sign, you'll have nothing to sell," and that if he did not sell the business, the lease could be renegotiated. Plaintiff signed, because, he testified, had he not signed he would not have been able to sell his business to Price. Mr. McNally agreed that he told plaintiff to sign the renewal documents or he would have nothing to sell, but denied that he told plaintiff to sign with the understanding the franchise terms would be discussed later. Mr. Price corroborated plaintiff's version of the March 20, 1980, meeting; Mr. McNally testified that only Miguel Escobar, plaintiff's brother, was present, and that Mr. Price was not. In this connection, it is relevant that Miguel Escobar, not Mr. Price, witnessed the franchise renewal package.

The relationship between plaintiff and Mobil continued to deteriorate after March 20. There were three principal areas of disagreement. One was plaintiff's failure to purchase gasoline; one was plaintiff's refusal to pay any rent after May, 1980, and less rent than Mobil demanded for March, April and May, 1980; the third was plaintiff's storage of unregistered motor vehicles and junk automobiles in the station parking lot.

Starting in 1979, plaintiff had failed to purchase gasoline regularly. Plaintiff testified that Mobil refused to sell him gasoline in the amounts he wanted, i.e., "part-loads." He testified that purchasing a full load would have been too expensive for him, since a full load could have cost as much as $13,000. All the Mobil employees who testified indicated that it was Mobil policy not to sell part-loads of gasoline to dealers with adequate storage; it was undisputed that plaintiff had adequate storage.

The record indicates that plaintiff did purchase at least some gasoline in 1980. A Mobil invoice dated June 30, 1980, Plaintiff's Exhibit 6, shows that plaintiff received 6,300 gallons of gasoline (a part-load), for which he paid $8,013.20. That sum included a $976.50 rental payment. A second invoice, dated August 19, 1980, Plaintiff's Exhibit 7, shows that Mobil was prepared to deliver 3600 gallons of gasoline (a part-load) to plaintiff, but the invoice does not show that the gasoline was either received or paid for. Mobil refused to sell plaintiff any gasoline because of the rental dispute after August, 1980. There was testimony that Mobil had not "cut off" any other dealers because of a rent dispute and that the decision not to sell gasoline was made by the Mobil credit manager.

From the day that he learned of the rental price increase in the 1980 lease renewal package, plaintiff balked at paying it. It is undisputed that he made his opinion of the increase clear to McNally, the marketing representative. He testified that, at the time he signed the lease, he believed the rent increase was negotiable. Plaintiff also testified that all he now owes Mobil is the rent due under the '77 agreement.

The evidence shows that in August, 1979, McNally calculated a proposed rent for the '80 lease. The rent calculation was based in part on the "normal volume" of gasoline sold by plaintiff. Normal volume

represents a partially historical, partially optimum and partially projected estimate of the number of gallons of gasoline a dealer has sold and Mobil believes will sell during the course of a month. Using available figures, Mobil determined that plaintiff's normal volume was 30,000 gallons per month.

In calculating the 1980 rent, McNally had no access to plaintiff's financial records. He calculated the monthly gasoline rental, in accordance with ordinary Mobil procedures, by multiplying the normal volume by the standard gallonage rent, or 1.6 cents. The gasoline rental is eighty per cent of the product, or $384.[2] The alternate profit center rental which McNally recommended was $700, collected at 13.5 cents per gallon. Area manager Brigati testified that the APC rent was usually 15–20% of a dealer's gross profit. On cross-examination, Brigati admitted that the normal volume had been calculated on the basis of 1975 figures, and that marketing conditions had changed since then.

During the time to be covered by the 1980 lease, plaintiff was limited to an allocation of 7700 gallons per month by the Connecticut Department of Energy. Even though the figure was later raised to 8,500 gallons per month, the total gallonage allocation was, by far, less than the "normal volume." McNally, however, had executed a hardship application for plaintiff, requesting a greater allocation or a "set-aside" from the Connecticut authorities. Although the application was granted, plaintiff never purchased the gasoline; plaintiff testified that he did not do so because Mobil would only deliver the set-aside within a full load, which he could not afford.

The collection rate approved for the 1980 lease agreement was 15.1 cents per gallon; thus, under that agreement, plaintiff would have been obligated to pay 15.1 cents for each delivered gallon of gasoline until he paid the $1,084 minimum rental. Mobil area manager Steven Brigati testified that the 15.1 cent collection rate was the highest in his area and that the next highest rate

was 6 cents. He added that plaintiff's rate was the highest because his volume was the lowest and that the high rate acted as "insurance" for Mobil that it would be paid the full rental. Mobil paid a third-party owner $15,500 in annual rent for plaintiff's station, plus $4,500 for local taxes.

There was admittedly some confusion regarding which rental amount was due when. In January and February, 1980, plaintiff was obligated to pay $350 per month rent, plus $31 for sign rental, pursuant to the terms of the 1977 lease. The January 2 ninety-day extension letter purportedly extended that 1977 rate through May, 1980. The 1980 lease called for a much higher rental, beginning on March 1, 1980. Shortly after he signed the 1980 lease, plaintiff received an undated letter from Mobil, saying that Mobil was rescinding a temporary lease adjustment, and that plaintiff was obligated to pay $350 per month rental, at 2.25 cents per delivered gallon.

According to his testimony, plaintiff never believed that he was required to pay the 1980 rent, in part because he had not agreed to the rate and in part because McNally told him that the rate was negotiable after signing the 1980 lease. Plaintiff got the opportunity to speak with Mobil officials regarding the rental on June 27, 1980. Accompanied by his attorney, plaintiff met with Brigati and others at Mobil offices in Scarsdale, New York. It was undisputed that Mobil agreed to consider making a rental adjustment based on hardship. To this end, plaintiff was to supply Mobil with certain financial information by July 3, 1980, but he was unable to get the information from his accountant for Mobil by that date.

Mobil pursued the matter of unpaid rent through the summer. On August 15 and August 25, Mobil officials wrote to plaintiff, complaining of the rental deficiency. It appears that plaintiff made one payment in June, and that this was credited against rent owed.

**2.** Thus, the calculation is $(1.6 \times 30{,}000) \times .8 = 384$.

Plaintiff testified that he tendered Mobil credit card receipts worth $1,400 to McNally in late November, 1980, but McNally refused to take them. McNally testified that plaintiff never made such a tender and that in fact, he had not visited plaintiff's station in November or December, 1980.

At the same time Mobil was discussing rental deficiencies with plaintiff, it was also complaining to him about the overall poor appearance of plaintiff's station.[3] Specifically, Mobil was unhappy about the unregistered and "junk" vehicles on the premises. It is undisputed that both were prohibited by paragraph 7(d) of the 1980 lease.[4] It is also undisputed that Mobil had made the same complaints to plaintiff from 1973 on.

The evidence clearly showed that as of June 14, 1980, there were several unregistered motor vehicles on the premises. There was also evidence that, at various times, plaintiff stored junk automobiles and junk automobile parts at the station.

On several occasions, Mobil representatives visited plaintiff's station and discussed the vehicles with him. The same topic was discussed at the June 27 meeting in Scarsdale and in letters to plaintiff dated June 3, June 23 and August 25, 1980.

Mobil agreed to meet with plaintiff and his attorney and a meeting was scheduled for September 11, 1980. On that day, plaintiff's attorney was detained in court; plaintiff testified that he called Mobil to reschedule the meeting. Later that day, plaintiff received a hand-delivered letter signed by Rucci terminating the 1980 agreement. The letter cited the non-payment of rent as a ground for termination. Plaintiff was given forty-eight hours to remove his personal property from the station.

Plaintiff refused to quit the premises and Mobil instituted a summary process action in Connecticut Superior Court on September 29, 1980. Plaintiff retained new counsel who arranged a meeting with Mobil representatives and Mobil's attorneys for October 9, 1980. It was at this meeting that plaintiff turned over the financial information Mobil had requested on June 27.

The summary process action was dismissed on October 28 on procedural grounds. Thereafter, Mobil sent plaintiff a second termination letter, dated November 5, 1980, which listed a number of reasons for termination. The November 5 letter contained this paragraph:

> Under the circumstances, we honestly believe that your termination on September 11 could have come as no surprise to you and that our notice to you on September 11, 1980 was legally sufficient and in compliance with the law. If, however, a court of competent jurisdiction should determine that you were entitled to receive 90 days' notice, we will of course abide by that decision. In that case, this letter will serve as a supplemental notice that we intend to terminate your Retail Dealer Contract and Lease Agreement for all of the reasons set forth herein and that the termination will take effect on December 10, 1980 or the earliest other date the court should rule the law requires, but in no event later than 90 days from the date of this letter.

Mobil commenced a second summary process action. Plaintiff then filed the present action in state court to restrain Mobil from prosecuting the summary process action. He secured a temporary injunction but, before a hearing on the merits could go forward, Mobil removed the action here.

## II.

Title I of the Petroleum Marketing Practices Act protects franchisees[5] from arbi-

---

**3.** As discussed in note 6, Mobil did not pursue its claim under 15 U.S.C. § 2802(b)(2)(B) in its post-hearing brief.

**4.** The '77 lease also contained provisions relating to station appearance in paragraph 6.

**5.** Neither party has devoted much attention to application of the Act's definitions. Probably this is so because the matter really is not subject to dispute. On the facts so far adduced, plaintiff appears to be a franchisee within the meaning of section 2801(4); defendant a franchisor, section 2801(3) and their relationship a

trary or discriminatory termination and non-renewal of their franchises. Franchisors are prohibited from terminating franchises or failing to renew them at expiration unless termination or non-renewal is based on grounds specified in the Act and accomplished in accordance with the Act's notice requirements. · S.Rep.No.95–731, 95th Cong., 2d Sess. 15 (1978), *reprinted in* [1978] U.S.Code Cong. & Admin.News 873, 874.

The Act's legislative history reveals that Congress was concerned with the often unequal bargaining power between the franchisor and franchisee. *Id.* at 17, [1978] U.S. Code Cong. & Admin.News at 876. The centerpiece of the Act is the standards it sets for termination or non-renewal, which insure that franchisors terminate only for serious franchise misconduct which undermines the entire relationship and not for technical or minor violations. *Id.* at 18, [1978] U.S.Code Cong. & Admin.News at 876. *See* 15 U.S.C. § 2802(b).

The Act includes its own standard for granting preliminary injunctions, 15 U.S.C. § 2805(b)(2), which provides that

the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

*See* S.Rep.No.95–731, 95 Cong., 2d Sess. 40–42, *reprinted in* [1978] U.S.Code Cong. & Admin.News 899–900. *Cf. Caulfield v. Board of Education of New York*, 583 F.2d 605, 610 (2d Cir. 1978) (Second Circuit preliminary injunction standard).

■ The Act puts the burden of proof on the franchisee to show termination of the franchise. 15 U.S.C. § 2805(c). The parties agree that the 1980 franchise has been terminated, so the first branch of the preliminary injunction standard, section 2805(b)(2)(A)(i), is satisfied.

Mobil bears the burden of going forward with evidence of permitted termination under section 2802(b). *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) (burden of proof in discriminatory treatment case under Tit. VII). Mobil contends that the evidence introduced at the hearing meets this burden. Specifically, it argues that it complied with the notice requirements of section 2804 and that termination was proper under sections 2802(b)(2)(A)(i), (b)(2)(B) and (b)(2)(C)(i).[6]

Although Mobil has the burden of going forward, it does not, contrary to plaintiff's contention, bear the burden of proof of permitted termination under section

franchise, section 2801(1)(A)(ii). *See also* 15 U.S.C. §§ 2801(1)(B)(i), (B)(ii)(I), (B)(ii)(II).

**6.** Mobil had claimed in its pre-hearing brief that termination was proper under section 2802(b)(2)(B), but does not make the same claim in its post-hearing brief. In general, section 2802(b)(2)(B) deals with franchisee failure to carry out the provisions of the franchise with good faith efforts. Mobil's original claim was that despite having received written notice, plaintiff was in breach of paragraph 7(d) of the 1980 service station lease, which restricted retention of unregistered motor vehicles on the station premises, and had made no effort to remedy the breach.

Although the evidence clearly indicated that plaintiff remained in breach of paragraph 7(d), the exhibits as well as the oral testimony showed that some improvements had been made. *Compare* Defendant's Exhibit D (photographs taken Mar. 20, 1980) *with* Defendant's Exhibit G (photographs taken June 14, 1980). There was, at the very least, some attempted compliance with paragraph 7(d), which may satisfy the "good faith" standard of section 2802(b)(2)(B); whether it also cures the breach is another question, which need not be addressed for resolution of this motion.

2805(c), at least on plaintiff's application for a preliminary injunction under section 2805(b)(2).[7] On a motion for interim injunctive relief under section 2805(b)(2)(A)(ii), plaintiff-franchisee bears the burden of showing sufficiently serious questions going to the merits. Thus, once the franchisor has met its burden, the burden shifts to the franchisee under section 2805(b)(2)(A)(ii). *See generally* McCormick's Handbook of the Law of Evidence §§ 336–338 (2d ed. 1972).

## A.

Franchisors may terminate any franchise if proper notice is given to the franchisee and the grounds are proper grounds under the Act. 15 U.S.C. § 2802(b)(1)(A) and (B). Notice *and* proper grounds are required. S.Rep.No.95–731, 95th Cong., 2d Sess. 33 (1978), *reprinted in* [1978] U.S.Code Cong. & Admin.News 873, 891.

Mobil argues that its September 11, 1980, notice was legally sufficient under the circumstances, 15 U.S.C. § 2804(b)(1), and that, if it was not, its November 4, 1980, notice cured any defects in the September 11 notice and was itself legally adequate. Plaintiff contends that the September 11 notice was improper under the Act and that since the Act "does not allow for any pleading in the alternative or for supplementary curative notices" the November 4 notice had no legal effect.

The Court is not presently persuaded by the rigid position which plaintiff would have the Court adopt as law, that a defective notice can never be cured. Neither *Blankenship v. Atlantic-Richfield Co.*, 478 F.Supp. 1016 (D.Or.1979) (lease not renewed), nor *Davy v. Murphy Oil Co.*, 488 F.Supp. 1013 (W.D.Mich.1980) (same), cited by plaintiff in support of his argument, is on all fours with the case at bar. It is not necessary for the Court to reach that issue in this case, however, because it is plain that Mobil never gave plaintiff adequate notice under the Act. Section 2804(a) requires a franchisor to furnish notification in writing, posted by certified mail or hand-delivered, containing a statement of intent to terminate, together with the reasons for termination, the effective date of termination and a summary of the Act's provisions. *See* 15 U.S.C. § 2804(c). The notice must be provided not less than ninety days before the effective date of termination. 15 U.S.C. § 2804(a)(2).

Mobil argues that its September 11 notice, which gave plaintiff forty-eight hours notice of termination, was reasonable because it came as no surprise to plaintiff, who had been in "flagrant breach" of the franchise agreement for over one year. For its "reasonableness" argument, Mobil relies on section 2804(b)(1) of the Act, which says that, "[i]n circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination . . . takes effect," the franchisor must take other steps.[8] *See* 15 U.S.C. § 2804(b)(1)(A), (B).

The language Congress used to carve out an exception to the ninety-day notice requirement, "circumstances in which it would not be reasonable," suggests that Congress was providing for circumstances created by an outside agency, such as condemnation of the marketing premises. In this case, nothing in the evidence suggests such a circumstance. There may be some case where a forty-eight hour notice would be reasonable, 15 U.S.C. § 2804(b)(1)(A), but nothing in this case, including plaintiff's past conduct, suggests that less than ninety-day notice is appropriate. Any other

---

7. The Act puts the burden of going forward with evidence of an affirmative defense on the franchisor. 15 U.S.C. § 2805(c). The Senate Report suggests that the burden of proof is also the franchisor's. S.Rep.No.95–731, 95th Cong., 2d Sess. 41 (1978), *reprinted in* [1978] U.S.Code Cong. & Admin.News 873, 899. *Cf. Texas*

*Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (Title VII burdens).

8. *Frisard v. Texaco, Inc.*, 460 F.Supp. 1094 (E.D.La.1978), cited by Mobil in support of its position, is a unique case, the precise facts of which can never reoccur. *Id.* at 1099.

conclusion would dilute Congress' intent to create "a single, uniform set of rules governing ... the notice which franchisors must provide franchisees prior to termination ... of a franchise." S.Rep.No.95–731, 95th Cong., 2d Sess. 19 (1978), *reprinted in* [1978] U.S.Code Cong. & Admin.News at 877.

Nor does the November 5 notice satisfy the Act's requirements, because Mobil did not give plaintiff a date on which the franchise was to end. 15 U.S.C. § 2804(c)(3)(B). The November 5 notice said that Mobil believed the September 11 notice was adequate, which meant that September 13 (forty-eight hours from the date of the notice) was the date of termination. The notice also said that, if a court should so determine, termination would take place December 10, or an earlier date, if the court should so rule, but no later than February 2, 1981.

If nothing else, plaintiff was virtually compelled to file suit to determine which of the four dates was actually the date of termination. While the November 5 notice complies in every other respect with the Act, the four alternate dates of termination really amount to no date at all, in violation of section 2804(c)(3)(B). When Congress passed the Act, it did not lightly set up notification requirements. When Congress required that termination notification include the date of termination, it plainly contemplated notice of a *specific* date. The spectrum of dates in Mobil's November 5 notice falls short of meeting that requirement. Accordingly, Mobil may not terminate plaintiff's franchise, since it failed to comply with the notice provisions of the Act. *See* 15 U.S.C. § 2802(b)(1)(A).

### B.

Mobil would otherwise have been legally justified in terminating plaintiff's franchise. *See Blankenship v. Atlantic-Richfield Co.*, 478 F.Supp. at 1019.

The record plainly shows that plaintiff's station had a generally poor appearance.[9]

This was due in part to storage of unregistered motor vehicles on the premises, crowding plaintiff's parking lot. Storage of unregistered motor vehicles on the station premises was specifically prohibited by the '77 franchise agreement and the '80 franchise agreement.

Photograph 1 in Defendant's Exhibit D, taken March 20, 1980, shows an unregistered motor vehicle. Mobil brought their concern regarding the problem to plaintiff's attention at a May 15, 1980 meeting at the station, yet Defendant's Exhibits D and E, photographs taken at the station May 27, 1980, show at least ten unregistered cars.

By letter dated June 3, 1980, Defendant's Exhibit A, Mobil demanded that plaintiff remove twelve unregistered vehicles from the station by June 14, 1980. Nevertheless, Defendant's Exhibit G, photograph 2, taken June 14, 1980, bears the marking "14 Unreg. Vehicles," some of which are visible.

By letter dated June 23, 1980, Defendant's Exhibit B, Mobil complained of "[e]ight unregistered vehicles stored on premises" on June 16, 1980. The problem was discussed at the June 27 meeting in New York.

On August 13, 1980, Mobil representatives visited plaintiff's station and found five unregistered motor vehicles. These were the subject of Defendant's Exhibit J, an August 25, 1980, letter complaining to plaintiff.

Plaintiff attempted to justify this conduct by arguing that Mobil knew of the problem since 1973, when plaintiff first took possession of the premises. While Mobil did not deny this knowledge, the Court fails to see how this justifies plaintiff's seeming breach. *Cf. Saad v. Shell Oil Co.*, 460 F.Supp. 114, 117 (E.D.Mich.1978) (cleanliness provision). This record does not indicate that Mobil ever abandoned its right to insist on compliance with its franchise agreement, or that it acquiesced in non-compliance.

---

**9.** *See* note 6, supra.

▮ The contractual prohibition against storage of unregistered motor vehicles is reasonable and materially significant to the franchise relationship. 15 U.S.C. § 2802(b)(2)(A). *Cf. Walters v. Chevron U.S.A., Inc.*, 476 F.Supp. 353, 356 (N.D.Ga. 1979) (cleanliness provision was material). Putting aside relevant aesthetic considerations, the unregistered motor vehicle provision helps prevent unnecessary and undesirable obstruction of consumer traffic at the station, helps keep open parking for customers and, indeed, prevents unwitting participation in storage of stolen cars by dealers.

▮ Each instance of noncompliance was a separate failure to comply within the meaning of section 2802(b)(2)(A)(i) of the Act, which requires the franchisor to have acquired knowledge of the failure within 120 days of notice of termination. *Kajdan v. Exxon Co. U.S.A.*, [1980–1] Trade Reg. Rep. (CCH) ¶ 63,262 at 73,305 (D.Conn. 1980); *Walters v. Chevron, U.S.A., Inc.*, 476 F.Supp. at 357; *see also* S.Rep.No.95–731, 95th Cong., 2d Sess. at 33–34, *reprinted in* [1978] U.S.Code Cong. & Admin.News at 892.

Mobil probably would also have been entitled to terminate the franchise under sections 2802(b)(2)(B)(i) and 2802(c)(8), since plaintiff admittedly failed to pay rent under the '80 agreement. Indeed, there was evidence that plaintiff failed to pay any rent after May, 1980.

Rent payments under the 1977 and 1980 agreements were tied to delivery of gasoline. Under the 1980 lease, for example, the rent was collected at 15.1 cents per delivered gallon until the $1,084 monthly amount due was paid. Plaintiff was nevertheless obligated to pay each month's rent, even if no gasoline was delivered.

Plaintiff testified that he refused to pay rent under the 1980 agreement, since he had not agreed to its terms. He also testified that he had not paid anything for certain months, even the $381.03 due under the 1977 lease. Specifically, plaintiff testified that he had made payments in accordance with Defendant's Exhibit I, which was not moved into evidence. Since plaintiff testified that the "rent paid" column of Exhibit I accurately described 1980 payments, the Court can assume he paid $381.03 for each month, January through May, 1980, and nothing thereafter.

However, Plaintiff's Exhibit 6, shows that plaintiff paid Mobil $8,013.20 on June 30, 1980, when gasoline was delivered, of which $976.50 was rent. Under the 1977 agreement, this would have paid plaintiff's rent for June, July and part of August, 1980. Under the 1980 lease, this amount would have paid part of the June, 1980, rent.

Plaintiff's Exhibit 7 is a customer invoice dated August 19, 1980. Payment requested was $4,647.90, of which $558 was rent. However, the invoice does not show that gasoline was delivered or that payment was made. The testimony of the witnesses was unclear in this regard.

There was no credible evidence that plaintiff tendered payment after August, 1980. After August, Mobil did not deliver any more gasoline, so plaintiff did not have the opportunity to pay rent on the delivered gallonage basis. Even so, he remained obligated to pay rent, despite Mobil's attempted termination in September, since he remained on the premises.

At most, it can be said that plaintiff raised a factual question concerning rent payments after May, 1980, and a legal question regarding his obligation to pay under the 1980 franchise package. Assuming *arguendo* plaintiff was obligated to pay only $381.03 per month and he paid Mobil $976.50 on June 30 and $558 on August 19, failure to pay after August, 1980, and failure to pay in a timely manner throughout 1980 would have justified Mobil's termination of the franchise.

### C.

Having concluded that notice of termination was inadequate, the only remaining

question [10] under section 2805(b)(2) is whether "on balance, the hardships imposed upon the franchisor by the issuance of [a preliminary injunction] will be less than the hardship which would be imposed upon [plaintiff]" if the injunction does not issue. 15 U.S.C. § 2805(b)(2)(B); *see Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302, 1304 (D.Minn.1979).

Even under the relaxed standards for injunctive relief set by the Act, preliminary injunctions are not granted as a matter of course. *Malone v. Crown Central Petroleum Corp.*, 474 F.Supp. 306, 312 (D.Md.1979).

Mobil's claimed harm if injunctive relief is issued is that it will suffer "destruction of its image, trademark identification and good will, it will continue to incur expenses for rental and taxes on the property and will continue to run the risk of losses due to the fact that it has no security deposit from [plaintiff] with respect to his credit cards." Plaintiff characterizes Mobil's contentions as "ludicrous," "bald assertions," which "cannot stand up to a reasoned scrutiny," and as "nothing more than sound and fury signifying nothing."

Plaintiff's claim of hardship is of course, loss of the franchise. To quote from plaintiff's post hearing brief, plaintiff's "business may be a small and sometimes financially strapped operation, but it is his own. Years of sweat and toil have gone into the building up of that business. It may not mean much to Mobil Oil Corporation, monolithic economic giant that it is, but it does mean something to Luis Escobar. Eight (8) years of his life are in that business."

Despite plaintiff's efforts, however, financial records submitted as evidence show that in 1979, plaintiff sustained a net loss of $30,432.10. Approximately 27% of the gross income for that year came from towing charges. Plaintiff testified that he was no longer doing towing work.

The same financial records show that for the first six months of 1980, plaintiff had a net loss of $17,169.23. There were no figures available for months after June, 1980.

Congress would not have enacted section 2805(b)(2)(B) if it expected an automatic conclusion that the balance of hardships always favors the franchisee. There are some cases where the franchisor will, on balance, suffer greater hardship. *Contra, Pearman v. Texaco, Inc.*, 480 F.Supp. 767, 770 (W.D.Mo.1979).

For example, this is a case where plaintiff's loss of the franchise may actually benefit him. Nevertheless, when balanced against the harm to Mobil, the Court concludes that plaintiff would suffer greater hardship if a preliminary injunction does not enter than would Mobil if the injunction is entered.

First, there is evidence that plaintiff's accumulated good will was worth approximately $75,000 on the market in early 1980. Second, the loss of the franchise, while not dispositive, is a factor to be considered. Here, plaintiff stands some chance of recouping his business losses if he runs the station during the remaining course of the litigation, but none if he is evicted. *See also Wojciechowski v. Amoco Oil Co.*, 483 F.Supp. 109, 112 (E.D.Wisc.1980); *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. at 1306.

### D.

Under section 2805(b)(3), the Court may require the franchisee to post a bond prior to the issuance of equitable relief. Other courts have imposed bonds in varying amounts. *Wojciechowski v. Amoco Oil Co.*, 483 F.Supp. at 116 ($25,000); *Sexe v. Husky Oil Co.*, 475 F.Supp. 135, 137 (D.Mont.1979) ($1,500).

On bonds required under Fed.R. Civ.P. 65(c), damages for the wrongful entry of injunctive relief are recoverable in the amount of actual damages. *Sanko Steamship Co. v. Newfoundland Refining Co.*, 437 F.Supp. 947, 949 (S.D.N.Y.1977). *See also Lever Brothers Co. v. International*

---

**10.** The Court has found it unnecessary to address any other issues raised in plaintiff's complaint.

*Chemical Workers Union*, 554 F.2d 115, 120 (4th Cir. 1976); *Silvers v. TTC Industries, Inc.*, 484 F.2d 194, 198 (6th Cir. 1973).

Accordingly, Mobil is enjoined from terminating its franchise relationship with plaintiff on the basis of either its September 11 or November 5 notices to plaintiff, provided plaintiff shall file a $10,000 surety bond with the Clerk of Court before the close of business on October 2, 1981.[11]

SO ORDERED.

---

11. This does not include surety for court costs. *See* Local R.Civ.P. 7(a).