**Phillip G. BROWN, d/b/a Brown's Fina, Ron Jackson, d/b/a Jackson's Fina, Raymond Jones, d/b/a Raymond's Baymeadows Fina and Eric Mueller, d/b/a Orange Park Fina, Plaintiffs,**

**v.**

**AMERICAN PETROFINA MARKETING, INC., (formerly known as American Petrofina Company of Texas), a corporation authorized to transact business in Florida, Clay Oil Corp., a Florida corporation, Sun States Oil, Inc., a corporation authorized to transact business in Florida and Huntley-Jiffy Stores, Inc., a corporation authorized to transact business in Florida, Defendants.**

**No. 82–1229–Civ–J–B.**

United States District Court,
M.D. Florida,
Jacksonville Division.

Feb. 3, 1983.

---

Jose A. Garcia, Winter Haven, Fla., for plaintiffs.

Earl M. Barker, Jacksonville, Fla., for American Petrofina.

William E. Kuntz and Robert M. Foster, Jacksonville, Fla., for Clay Oil and Huntley-Jiffy Stores.

Nelson M. Harris, Jr., Jacksonville, Fla., for Sun States Oil.

## OPINION AND ORDER

SUSAN H. BLACK, District Judge.

Plaintiffs, four local gasoline retailers, initiated this action pursuant to the Petroleum Marketing Practices Act, (hereinafter "PMPA"), 15 U.S.C. §§ 2801–2841, seeking preliminary and permanent injunctive relief from the allegedly wrongful nonrenewal of their lease agreements. After conducting an evidentiary hearing, the Court entered a preliminary injunction on January 7, 1983, in accordance with the provisions of section 2805(b)(2).[1] A further hearing was held on January 20, 1983, at which the propriety of a permanent injunction was considered. The Court will now address that issue.

## I. FACTUAL BACKGROUND

Plaintiffs Phillip Brown, Ronald Jackson, Raymond Jones, and Eric Mueller operate gasoline service stations under the "Fina" brand name in the Jacksonville, Florida area. Their present operating leases have expired and they have been notified by defendant Clay Oil Corporation (hereinafter "Clay"), that the leases will not be renewed. Defendant American Petrofina Marketing, Inc., formerly known as American Petrofina Company of Texas (hereinafter "Fina"), holds fee simple in three of the stations presently operated by plaintiffs and holds a long-term leasehold in the other station. For a period of several years, Fina has leased these premises to Clay. Clay has, in

---

1. Title 15, U.S.C. § 2805(b)(2) provides that:

    Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if—

    (A) the franchisee shows—

    (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

    (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

    (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

turn, leased the four stations to plaintiffs, who have operated them as retail gasoline and service outlets.

In early 1979, Clay received notice from Fina that the leases would not be renewed beyond their expiration date later that year. Clay filed suit against Fina and was granted preliminary injunctive relief. Before a final adjudication was reached, Clay and Fina settled their dispute. Under the terms of that settlement, Clay was given additional three-year leases on the properties which, in the case of the station located in Orange Park, Florida, expired on December 31, 1982, while the leases relating to the other three properties within Jacksonville expired on August 31, 1982. Also as part of the settlement agreement, Clay was given the option to purchase the properties at the expiration of the lease terms.

At some point near June 1, 1982, Fina notified Clay that it would not renew the leases on the three stations within Jacksonville. On June 1, 1982, Clay then notified plaintiffs Brown, Jackson, and Jones, its franchisees at the Jacksonville stations, of Fina's decision, informed plaintiffs that Clay would no longer have the right to lease the properties to them, and further stated that it could no longer grant the right to their use of the Fina trademark. On June 2, 1982, Fina also notified Clay it did not intend to renew the lease on the Orange Park station. On September 28, 1982, Clay notified plaintiff Mueller, its franchisee at that station, of Fina's decision and informed plaintiff Mueller that Clay could no longer grant possession of the property or use of the Fina trademark.

After notifying plaintiffs of Fina's decision of nonrenewal, Clay attempted to invoke its option to purchase the three Jacksonville properties. Fina balked and Clay again filed suit, this time to enforce the terms of its 1979 settlement agreement with Fina. The parties eventually settled. As a result, on October 27, 1982, Clay and Fina entered into a contract for purchase and sale of Fina's interests in six properties, including the three Jacksonville properties involved herein. Upon executing this con-tract, Clay assigned its rights thereunder to Huntley-Odum Properties, which intends to exercise the purchase rights and to rent the properties to defendant Huntley-Jiffy Stores, Inc. (hereinafter "Huntley-Jiffy").

On August 31, 1982, the date on which the leases for the three Jacksonville properties expired, Clay and Fina were embroiled in their dispute over Clay's claimed right to purchase the properties. Clay suspended its service as of that date, but defendant Sun States Oil, Inc. ("Sun States"), given plaintiffs' uncertain future, agreed to supply plaintiffs Brown, Jackson and Jones with gasoline until the underlying dispute between Fina and Clay could be settled. The arrangement was understood by all parties to be of a temporary nature.

With plaintiff Mueller's lease expiration date imminent and the other plaintiffs' dates having already passed, plaintiffs filed suit on December 23, 1982, requesting that the proposed sale of the properties be enjoined and contending that under the terms of the PMPA defendants had wrongfully failed to renew the leases. As noted above, the Court granted plaintiffs' request for a preliminary injunction and set the hearing for permanent injunctive relief on an expedited basis. Each of the four defendants contends that plaintiffs are not entitled to relief against it and asks the Court to dismiss plaintiffs' suit. Before considering the merits of the parties' positions, the Court finds it appropriate to examine generally the purpose and content of the PMPA.

## II. THE ACT

The PMPA, which became effective on June 19, 1978, was passed in order to establish minimum federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of the fuel. S.Rep. No. 731, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 873. Congress, in enacting the PMPA, perceived a disparity in bargaining power between the large petroleum refiners and the small service station retailers. The PMPA was, therefore, designed to protect

the retailers from arbitrary or discriminatory termination or nonrenewal of their franchises. *Id.* However, Congress was also aware of the franchisor's need for adequate flexibility so that they may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences. *Id.* at 877.

The PMPA represents an attempt to balance these distinct and often competing interests. In order to accomplish this balancing of interests, the PMPA prohibits franchisors from terminating or not renewing the franchise agreement, except for certain grounds specified therein and upon proper notice being given to the retailer. Section 2802(a) provides the general prohibition against termination or nonrenewal, while section 2802(b) implements the notice requirements and enumerates the permissible grounds for termination or nonrenewal of the franchise. Section 2804 fully delineates the form of notice necessary to satisfy section 2802(b)'s general directive that notice be given to the retailer prior to termination or nonrenewal. Given this skeletal overview of the PMPA, the Court turns to the contested questions of this case.

## III. ANALYSIS

Plaintiffs contend that each of the four named defendants have violated the PMPA's provisions concerning the proper procedure for nonrenewal of a franchise. As relief, plaintiffs seek to invoke the 45-day right of first refusal to purchase the properties set forth in section 2802(b)(3)(D)(iii).[2] In addition, of course, plaintiffs ask that the anticipated sale of the properties to Huntley-Odum in conjunction with the settlement agreement between Fina and Clay be permanently enjoined. Because each defendant is in a factually distinct posture and because the defendants do not assert identical legal theories, the Court will consider each defendant's position separately.

### A. *Defendant Fina*

Fina's position is basic. It points out that the PMPA regulates franchise relationships between a franchisor and a franchisee and that central to such a relationship is the existence of a contractual agreement between the parties. Fina notes the uncontradicted evidence that no contract has ever existed between it and any of the plaintiffs. Thus, Fina maintains that the PMPA is inapplicable to its relationship with any of the four plaintiffs.

The Court agrees. Section 2801 defines the essential terms of the PMPA. Under

**2.** Title 15, U.S.C. § 2802(b)(3) states:

> For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:
>
> . . . .
>
> (D) In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if—
>
> (i) such determination is—
>
> (I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,
>
> (II) to materially alter, add to, or replace such premises,
>
> (III) to sell such premises, or
>
> (IV) that renewal of the franchise relationship is likely to be uneconomical to the fran-

chisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

(ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this title, either—

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

subsection (4) of that section, "franchisee," which plaintiffs claim to be with respect to Fina, is defined as "a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." "Franchisor," which plaintiffs assert Fina is with respect to them, is defined in subsection (3) to mean "a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." Subsection (1)(A) indicates that "franchise" means any contract between a refiner and a distributor, a refiner and a retailer, a distributor and another distributor, or between a distributor and a retailer "under which a refiner or distributor (as the case may be) authorizes . . . a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use." Finally, the term "contract," as used above, is defined in subsection (10) as "any oral or written agreement."

The above-stated definitions reveal that in order for plaintiffs to be afforded the protections given to franchisees under the PMPA, there must be a franchise. In order for a franchise to exist, there must be a contract—either written or oral—between the parties which pertains to the sale or distribution of motor fuel. *Bsales v. Texaco, Inc.,* 516 F.Supp. 655, 661 (D.N.J.1981).

In the instant case, the evidence could not be any clearer on that question. Fina's dealings in this matter were exclusively with Clay. All four plaintiffs readily conceded that they had never entered into any form of agreement with Fina—either oral or written. Rather, plaintiffs dealt with Clay in maintaining and operating their service station and all lease negotiations were conducted with Clay. No other evidence was introduced which could cause the Court to reach a contrary conclusion. Furthermore, no allegations were made that Fina employed Clay as an artifice to circumvent the provisions of the PMPA. Clearly, such an allegation would have been groundless. Fina and Clay are independent entities which have dealt at arms length throughout this matter. This is evidenced by the several legal actions instituted between them. Given the absence of any contract or other agreement, the Court finds that plaintiffs, with respect to Fina, are not franchisees within the terms of the PMPA. Thus, plaintiffs' claims against Fina are without merit.

### B. Defendant Huntley-Jiffy

Like Fina, Huntley-Jiffy maintains that plaintiffs are entitled to no relief against it under the PMPA because they have never entered into any form of contract with plaintiffs. Consistent with its earlier conclusion, the Court finds Huntley-Jiffy's position well-taken. Huntley-Jiffy is the proposed lessee of the properties in question after consummation of the anticipated sale to Huntley-Odum. It is clear that Huntley-Jiffy has had no dealings whatsoever with plaintiffs concerning the operation of these gasoline service stations. Thus, the Court finds that plaintiffs and Huntley-Jiffy are not, and have never been, in a franchisee-franchisor relationship, rendering the PMPA inapplicable. Plaintiffs' claims for relief will be denied as they relate to Huntley-Jiffy.

### C. Defendant Clay

Clay stands in a different relationship to plaintiffs than did either of the two defendants discussed above. Clay admits that plaintiffs were its franchisees and that the provisions of the PMPA govern their relationships. Clay contends, however, that its nonrenewal of the franchises was done in accordance with the PMPA's specifications, rendering meritless plaintiffs' claims for equitable relief.

Clay offers three grounds to justify its nonrenewal of plaintiffs' franchises: (1) that the renewal of the franchise would likely be uneconomical to Clay [section 2802 (b)(3)(D)(i)(IV)]; (2) that Clay lost the right to grant possession of the leased

premises [section 2802(b)(2)(C) [3] and (c)(4)] [4]; and (3) that Clay lost the right to grant the use of the trademark which is the subject of the franchise [section 2802(b)(2)(C) and (c)(6) ]. The Court will consider each of Clay's asserted grounds for nonrenewal in turn.

### 1. *Uneconomical Relationships*

■ In its letters notifying plaintiffs that their leases would not be renewed (Exhibits N, O, P, and U), Clay indicated that a "continuation of our relationship would likely be uneconomical to Clay Oil." As noted above, an uneconomical franchise relationship constitutes a permissible ground for termination under section 2802(b)(3)(D) (i)(IV). Plaintiffs, however, contend that that provision is inapplicable here because they had never operated under a three-year franchise, nor had they been offered the option to do so.

The Court agrees with plaintiffs' argument. Application of section 2802(b)(3)(D) (i)(IV) appears to be conditioned upon a three-year term of franchise between the franchisee and the franchisor. This is so because the uneconomical justification for nonrenewal in section 2802(b)(3)(D)(i)(IV) is couched in terms of section 2802(b)(3)(D), which applies "in the case of any franchise entered into or renewed on or after [June 19, 1978] (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer)." While three of the plaintiffs had leased the same premises from Clay under a franchise agreement for over eight years, plaintiffs operated under franchises of one-year terms which were renewed annually. Thus, because plaintiffs had not operated under, nor were ever offered the option of operating under, a three-year lease, the ground that the franchise was uneconomical to Clay is insufficient to support the attempted nonrenewal of the franchise. *See Daniels v. Dilmar Oil Co.,* 502 F.Supp. 178, 181 (D.S.C.1980).

■ In rejecting Clay's first asserted ground for nonrenewal, the Court notes that the reasoning employed therein also serves to foreclose plaintiffs' request for a 45-day right of first refusal to purchase the properties. Sections 2802(b)(2)(E)(iii)(I) [5]

**3.** Title 15, U.S.C. § 2802(b)(2)(C) provides that:
The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—
(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or
(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

**4.** The pertinent portions of 15 U.S.C. § 2802(c) provide:
As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as—
. . . .
(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if

the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise—
(A) of the duration of the underlying lease, and
(B) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);
. . . .
(6) loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor;

**5.** The pertinent portions of 15 U.S.C. § 2802(b)(2) state:
(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the

and 2802(b)(3)(D)(iii)(II) [6] represent the only provisions within the PMPA which afford franchisees the right of first refusal to purchase the properties. Both of these subsections are, as was the ground for nonrenewal based upon an uneconomical relationship, conditioned upon the existence or offer of a three-year term of lease between the franchisor and the franchisee. Therefore, just as Clay is not entitled to rely on an alleged uneconomical relationship with plaintiffs in order to end its franchise relationship, neither are plaintiffs entitled to obtain a right of first refusal to purchase the properties. In the event that any relief were to be forthcoming, plaintiffs would be forced to accept an alternate remedy.

### 2. Loss of Right to Grant Possession

Clay's second asserted justification for nonrenewal is that it no longer has the right to grant possession of the leased premises because its underlying lease with Fina has terminated. Section 2802(c)(4) specifically recognizes this as "an event which is relevant to the franchise relationship and as a result of which . . . nonrenewal of the franchise relationship is reasonable," as that phrase is used in section 2802(b)(2)(C).

■ However, in order for Clay to properly refuse to renew due to its loss of the right to grant possession of the leased premises, Clay was required to have given notice to plaintiffs in accordance with section 2802(c)(4). *See Veracka v. Shell Oil Co.,* 655 F.2d 445, 449 (1st Cir.1981) (specific notice requirement of that section meant to supplant more general notice requirement applicable to other grounds for termination or nonrenewal within section 2802(c)); *accord, Gaspar v. Chevron Oil Co.,* 490 F.Supp. 971, 975 (D.N.J.1980). Section 2802(c)(4) provides that loss of the right to grant

possession of the premises is a valid reason for nonrenewal, if

the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise—

(A) of the duration of the underlying lease, and

(B) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of the term (in the case of nonrenewal).

Clay concedes that it "did not strictly comply with the unique written notice provisions of section 2802(c)(4)." Memorandum of Defendant Clay Oil Corporation in Opposition to Plaintiffs' Complaint for Permanent Injunctive Relief at 17. Apparently, Clay failed to provide plaintiffs with the contemplated written notice of the existence and duration of the underlying lease with Fina prior to its renewal of the franchises with plaintiffs. The effect of Clay's failure is in question herein. The limited precedent relevant to the question seems to indicate that Clay should be precluded from relying on its loss of the right to grant possession of the properties as a valid reason for nonrenewal. *See Blankenship v. Atlantic-Richfield Co.,* 478 F.Supp. 1016, 1018 (D.Ore.1979) (compliance with specific notice provisions of PMPA is a mandatory prerequisite to nonrenewal and the court has no power either to cure or to waive a notice defect); *see also Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1388 (10th Cir.1981) and *Davy v. Murphy Oil Corp.,* 488 F.Supp. 1013, 1016 (W.D.Mich. 1980) (expressly following *Blankenship* ).

The facts of this case cause the Court to hesitate in applying the rigid approach to the PMPA's notice requirements taken in *Blankenship.* Here, all plaintiffs were, without question, aware of the existence of

---

relevant geographic market area in which the marketing premises are located, if—

. . . .

(iii) in the case of leased marketing premises—

. . . .

(I) the franchisor, during the 180–day period after notification was given pursuant to section 2804 of this title, either made a bona

fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises[.]

**6.** See note 2.

Clay's underlying lease with Fina at the time they entered into their last franchise renewal with Clay. This is apparent not only from plaintiffs' testimony to that effect, but also from their knowledge of the 1979 litigation between Clay and Fina. Moreover, the evidence seemed to reveal that plaintiffs were aware that the lease between Clay and Fina, if not renewed, would expire in 1982. Thus, plaintiffs had actual knowledge of substantially all the information required by section 2802(c)(4), despite Clay's failure to give them written notice. The question is whether the notice provision requiring a writing should be strictly construed regardless of any actual notice on the part of plaintiffs.

The Court finds this to be a very close question involving an examination of several countervailing factors. As noted earlier, the PMPA was enacted largely to protect retailers such as plaintiffs from the arbitrary nonrenewal or termination of their franchises. Given that, it can readily be argued that the PMPA's provisions must be strictly complied with in order to permit a franchisor such as Clay to end a franchise relationship. Furthermore, the approach taken in *Blankenship* is easily applied. The Court need only look to the timely existence of a proper writing to determine whether the nonrenewal was permissible. On the other hand, an approach more flexible than the one adopted in *Blankenship* would permit the Court to go beyond form and examine the true substance of the matter. The Court could determine whether plaintiffs were actually aware of the information which Congress required they have under section 2802(c)(4) and whether they were prejudiced by not having had the notice in writing. However, the Court need not re-

solve this issue in order to dispose of the case. As will be discussed below, Clay's third asserted justification for nonrenewal provides a valid basis under the PMPA for refusing to renew plaintiff's franchises.

3. *Loss of Right to Grant Trademark*

■ Clay's final justification offered in support of its nonrenewal of plaintiffs' franchises is that Clay lost the right to grant plaintiffs the use of the Fina trademark. Section 2802(c)(6) recognizes the loss of the right to grant the use of the trademark as an event relevant to the franchise relationship as set forth in section 2802(b)(2)(C). A further requirement of section 2802(b)(2)(C) is (a) that the loss of the right to grant the use of the trademark occurred during the period that the franchise is in effect; (b) that the franchisor acquired actual or constructive knowledge of the occurrence not more than 120 days before the date on which it notified the franchisee of the nonrenewal; and (c) that notice to the franchisee was accomplished in the manner prescribed in section 2804(a).

These requirements have been satisfied here. Clay was notified by Fina during the existence of Clay's franchise relationships with plaintiffs that it would lose its rights to grant further use of the trademark. Shortly thereafter, well within the 120-day limit, Clay notified plaintiffs of the loss of the right to grant the use of the trademark. Finally, the form of notice given by Clay to plaintiffs comports with the pertinent provisions of section 2804[7]. Exhibits N, O, P, and U, letters sent by Clay to the plaintiffs, were sent by certified mail, contained the statement that Clay was to lose the right to grant the use of the Fina trademark, and that the nonrenewal would be effective on December 31, 1982, with respect to plaintiff

---

**7.** The relevant portions of 15 U.S.C. § 2804 state:

   (a) Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship—
   (1) in the manner described in subsection (c) of this section;
   . . . .
   (c) Notification under this section—

(1) shall be in writing;
(2) shall be posted by certified mail or personally delivered to the franchisee; and
(3) shall contain—
(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;
(B) the date on which such termination or nonrenewal takes effect; and
(C) the summary statement prepared under subsection (d) of this section.

Mueller, and on August 31, 1982, with respect to the other plaintiffs. The letters also contained the necessary summary statement of the PMPA mandated by section 2804(c)(3)(C). Therefore, the Court finds that Clay's failure to renew the franchise agreements with plaintiffs was done on the basis of a valid ground and that proper notice was given to plaintiffs. Accordingly, plaintiffs are not entitled to relief from Clay under the PMPA.

### D. *Defendant Sun States*

The final defendant, Sun States, provided temporary service to plaintiffs after their franchises with Clay had expired and during the pendency of the dispute over the various parties' rights in the properties. Plaintiffs refused to enter into any franchise agreement with Sun States. All parties were aware that Sun States was to supply plaintiffs with motor fuel products so that plaintiffs could remain open for business while the various legal disputes were being resolved. This decision resolves those disputes. Accordingly, Sun States' rights and obligations concerning plaintiffs are at an end. Plaintiffs are entitled to no relief against Sun States under the terms of the PMPA.

### E. *Attorney's Fees*

Defendants Huntley-Jiffy, Clay, and Sun States have moved the Court for an award of attorney's fees pursuant to section 2805(d)(3)[8]. Under that section, the Court may, in its discretion, direct plaintiffs to pay defendants' reasonable attorney and expert witness fees if plaintiffs' action is deemed frivolous. With respect to Clay, plaintiffs' claim was clearly not frivolous. The issues raised called for substantial statutory interpretation by the Court. Moreover, only one of the three reasons offered by Clay for its nonrenewal of the franchise was held to be valid under the PMPA. Thus, Clay is not entitled to reimbursement from plaintiffs for expert witness or attorney fees. As to the remaining defendants, plaintiffs' claims undeniably had less merit.

However, because plaintiff sought injunctive relief on the basis of its claim against Clay and because entities other than Clay were involved in the impending sale of the properties, plaintiffs acted prudently in naming all parties to the transaction known to them so that the Court would not be forced to enter a preliminary injunction without notice to those entities. Therefore, the Court, acting in its discretion, will deny the remaining defendants' request for the payment of expert witness and attorney fees by plaintiffs.

In accordance with the foregoing, it is ORDERED:

1. That plaintiffs' request for permanent injunctive relief is denied. The Clerk shall enter Judgment in favor of defendants and against plaintiffs.

2. That the preliminary injunction, entered herein on January 7, 1983, is dissolved.

3. That defendants' requests for attorney and expert witness fees from plaintiffs are denied.

---

8. Title 15, U.S.C. § 2805(d)(3) provides:
    In any action under subsection (a) of this section, the Court may, in its discretion, direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.