In re **LAFAYETTE RADIO ELECTRON-ICS CORPORATION et al., Debtors.**

**Bankruptcy No. 880–00042.**

United States Bankruptcy Court, E. D. New York.

Nov. 14, 1980.

Levin & Weintraub, New York City, for debtor.

James H. Poole, Orange, Cal., for Tustin.

Zalkin, Rodin & Goodman, New York City, for secured lenders.

C. ALBERT PARENTE, Bankruptcy Judge.

Lafayette Radio Electronics Corporation together with its affiliated corporations (hereinafter collectively referred to as "Lafayette"), as debtor–in–possession in Chapter 11 proceedings, seeks, pursuant to § 365 of the Bankruptcy Code, to assume the unexpired lease under which it is a tenant of premises located at 1988 North Tustin Avenue, Orange, California. The present proceeding represents but one of many executory lease assumptions in Lafayette's plan of reorganization.

The stated objective of the debtor is to generate a "stream of income" by assuming the leases of the vast majority of its locations and then subletting the same at a higher rate of rent.

The landlord of the shopping center premises in question, Tustin Square, objects to the attempted assumption on the grounds that: (1) the debtor has not and cannot meet the requirements of § 365; and (2) it would be inequitable to permit assumption.

The lease in question was entered into on April 19, 1974, by the predecessors–in–interest of both the landlord and the tenant. The original term of the lease is ten years with two options to renew for a period of five years in each instance.

The debtor operated a retail store at the location until financial difficulties forced its closing more than one year prior to the filing of the Chapter 11 reorganization petition. While the store was shut down, it was used as a storage facility by Lafayette. Rent was continuously paid and accepted throughout the nonactive period, save that of December 1979.

On December 18, 1979, less than one month prior to the filing of its Chapter 11 petition, the debtor sublet the premises to James and Ann Kavanagh, d/b/a Nautilus of Orange Fitness Center. Lafayette filed for reorganization under Chapter 11 on January 4, 1980. Since that time, the debtor has received this Court's permission to assume many of its other executory leases. Lafayette moved by application dated April 17, 1980, and by order to show cause dated April 21, 1980, for authorization to assume the lease in question (identified as #149).

A hearing on the order to show cause was held on May 5, 1980. The landlord did not appear. The answering papers submitted by the landlord were not received by the Court until after the hearing. By reason of the relatively short notice given the landlord, the Court granted the landlord's subsequent motion for reargument. The matter came on for rehearing before this Court on June 17 and June 18, 1980. The sole wit-

ness to testify was Mr. Robert Crimmins, Director of Real Estate for the debtor.

### Policy Considerations Underlying Assumption

Reorganization under Chapter 11 of the Bankruptcy Code, by definition, involves the restructuring of a qualifying debtor's financial arrangements so that the debtor is afforded the opportunity to achieve renewed viability. In order to relieve the debtor of the burden of meeting certain of its pre–filing contractual commitments, and to simultaneously preserve those contractual commitments which will make rehabilitation possible, the Chapter 11 trustee or debtor–in–possession, as the case may be, is given the option, upon satisfying the requirements of § 365 and gaining the Court's approval, of assuming or rejecting any of the debtor's executory contracts or unexpired leases. 11 U.S.C. § 365.

The law, however, is not unmindful that the other party to a contract or lease sought to be assumed has rights which need to be preserved. In order to insure that such other party receives the full benefit of its bargain in the event of an assumption, § 365 of the Code requires the trustee or debtor–in–possession to: (1) cure existing defaults or provide adequate assurance that such defaults will be promptly cured, § 365(b)(1)(A); (2) compensate parties (other than the debtor) to such contract or lease for actual pecuniary loss resulting from defaults by the debtor or provide adequate assurance that such parties will promptly be so compensated, § 365(b)(1)(B); and (3) provide adequate assurance of future performance under such contract or lease, § 365(b)(1)(C).

■ If the court determines that assumption would substantially further the debtor's reorganization effort and that the rights of other parties to the contract or lease are receiving their due recognition and protection, the court is obliged to grant the necessary approval. *See* House Report No. 95–595, 95th Cong., 1st Sess. (1977) 348–49; *and* Senate Report No. 95–989, 95th Cong., 2nd Sess. (1978) 59, U.S. Code Cong. & Admin. News 1978, p. 5787.

### The Bankruptcy Clause in the Lease Does Not Prevent Assumption

Article 19.06 of the lease in question is stylistically referred to as an *ipso facto* or bankruptcy clause. The clause purports to empower the landlord to terminate the lease upon the tenant's filing a petition in bankruptcy, unless the tenant is performing all of the covenants of the lease. If applicable and enforceable, this clause would in effect preempt the attempted assumption.

■ Even assuming that this bankruptcy clause is applicable under the facts of this case, it is clearly unenforceable. Section 365(e)(1) of the Code provides:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
>
> . . .
>
> (B) the commencement of a case under this title . . .

The statutory invalidation of *ipso facto* or bankruptcy clauses represents a significant departure from prior statutory law. Section 70(b) of the former Act provided that bankruptcy clauses were enforceable. 11 U.S.C. § 110(b). However, in the leading case of *Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202 (2nd Cir. 1974), it was recognized that categorical enforcement of such clauses would in some cases defeat reorganization efforts and frustrate the underlying policies of the Act. The Court held that despite the presumption in favor of enforcing such clauses, they would be given no effect where the equities of the situation weighed heavily in favor of the debtor. *Id.* at 207; *accord, In re Great Scott Food Market, Inc.*, 1 B.R. 223 (Bkrtcy. D.R.I.1979); *In re LaCrosse Flite Center, Inc.*, 10 C.B.C. 856 (W.D.Wis.1976); *but cf.,*

*Matter of D.H. Overmyer Co., Inc.*, 510 F.2d 329 (2nd Cir. 1975). Thus, the matter of enforceability of bankruptcy clauses under the former Act was of necessity to be decided on a case–by–case basis.

Under the Code, there is a clear Congressional mandate that *ipso facto* or bankruptcy clauses are not to be enforced. § 365(e).

The legislative history of § 365 unequivocally states that such clauses are "made inapplicable during the case for the purpose of disporition [sic] of the executory contract or unexpired lease." H.R. No. 95–595, *supra*, at 349, U.S. Code Cong. & Admin. News 1978, p. 6305. It has thus been put beyond judicial peradventure that if the trustee or debtor–in–possession is otherwise able to assume an executory contract or unexpired lease of the debtor, it will not be barred from doing so by the existence of such a forfeiture clause.

While it is clear that *ipso facto* or bankruptcy clauses are unenforceable under the Code, it is equally clear that if a court is to permit assumption of a lease on behalf of a tenant debtor, it is required to give due regard for the interests of the landlord. The House Report provides:

> The unenforceability of ipso facto or bankruptcy clauses proposed under this section [365] will require the courts to be sensitive to the rights of the non–debtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the courts will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.

H.R. No. 95–595, *supra*, at 348, U.S. Code Cong. & Admin. News 1978, p. 6304.

*Defaults Under the Lease*

■ In order to assume an executory contract or an unexpired lease, a trustee or debtor–in–possession must remedy any existing defaults in accordance with the provisions of § 365(b)(1). Thus, the initial determination which must be made in an assumption case is whether there are any existing defaults under the contract or lease sought to be assumed.

The landlord claims eight existing defaults: (1) rent for the month of December, 1979; (2) unpaid real estate taxes which became due after the filing of debtor's petition in Chapter 11; (3) vacating the premises for over a year; (4) "downgrading" the shopping center by using the premises as a warehouse; (5) failing to repair a hole left in the roof by the removal of a television antenna; (6) permitting installation by the subtenant of exterior signs without the landlord's architectural approval; (7) failing to supervise the actions of the subtenant in the modification of the premises; and (8) authorizing "structural alterations" without the landlord's approval.

The lease provides, and the Court so finds, that California law governs the interpretation of the lease.

Lafayette contends that even if there were breaches of the lease in question, there are no existing "defaults." In support of the distinction drawn between "breach" and "default," the debtor points to the language of the lease itself. Article 19.03 clearly differentiates between the two terms. A "default" is in effect defined as the failure to cure a breach after *notice*. (Emphasis added). Thus, Lafayette contends that proper notice is a prerequisite for a claim of default.

The debtor does not dispute that it has an outstanding obligation to pay the December 1979 rent and certain 1979 real estate taxes, which obligation was known to it at the time it filed its Chapter 11 petition. The debtor has agreed to make the appropriate payments upon court authorization thereof. Such payment would cure these defaults. Therefore, the Court finds these defaults to be "curable," and for reasons discussed hereinafter, the Court is satisfied that the debtor will be able to effect such cure.

By letter dated May 22, 1980, from Mr. William E. Johnson, attorney for the subtenant to Levin & Weintraub, attorneys for the debtor, Lafayette was put on notice of a leak in the roof of the premises. It appears that the leak emanates from the location

formerly occupied by a television antenna installed and later removed by Lafayette. No affirmative action was taken by Lafayette to repair the roof by the date of the hearing, despite the fact that Article 22.16 of the lease specifically charges Lafayette with such responsibility. However, Mr. Crimmins, the Director of Real Estate for the debtor, testified that Lafayette is willing and able to bear the expense of repair, and had in fact instructed the subtenant, through its counsel, to have the necessary work performed. Lafayette's default is readily curable by having the subtenant cause the roof to be repaired at Lafayette's expense according to the terms of the lease.

The Court finds, for the reasons which follow, that the landlord is equitably estopped to claim the existence of any of the other alleged defaults; consequently, there is no cause to consider their respective merits.

Although nearly nine months have elapsed since the latest of these alleged breaches became known to the landlord, the record is devoid of any evidence tending to show that notice was ever given by the landlord to Lafayette as required by the lease. Only subsequent to the commencement of the present assumption proceeding did the landlord give any indication that it objected to Lafayette's past actions. Since the alleged commission of the breaches, the landlord has not only accepted rent payments continuously, but it has also made no attempt to discourage Lafayette or its subtenant from making costly improvements to the premises.

The landlord's failure to take action after it had gained knowledge of the alleged breaches and its uninterrupted acceptance of rent payments were in effect representations to Lafayette and its subtenant that business could continue as usual. Although several California courts have held that waiver will not arise where, as here, there is an express provision in the lease indicating that acceptance of rent is not to be deemed a waiver of the landlord's rights, *Salton Community Services District v. Southard*, 256 Cal.App.2d 526, 64 Cal.

Rptr. 246 (1967); *Karbelnig v. Brothwell*, 244 Cal.App.2d 333, 53 Cal.Rptr. 335 (1966), the Court rests its conclusion upon estoppel theory rather than waiver theory. California case law clearly recognizes the doctrine of equitable estoppel. *See, e. g., Salton Community Services District, supra.* Moreover, since this Court inherently possesses the powers of equity, *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), it may employ the equitable estoppel doctrine in a manner not inconsistent with the Code.

It is clear that in reliance on the landlord's inaction Lafayette viewed its position as secure enough to enter into a sublease, and the subtenant viewed its position as secure enough to make costly improvements to the premises. Had the landlord served timely notice of its objections on Lafayette, it is not likely that Lafayette and its subtenant would have so acted. Furthermore, Lafayette would have been in a better position to cure the alleged structural alteration breaches. It was incumbent on the landlord to serve timely notice upon Lafayette if it intended to claim defaults under the lease. *In re Sapolin Paints, Inc. and Woolsey Marine Industries, Inc.*, 5 B.R. 412, 2 C.B.C.2d 854, 862 (Bkrtcy.E.D.N.Y.1980) (applying California law). It would be inequitable to allow the landlord to step in at this late date to claim for itself a windfall consisting of the difference between a newly negotiated rental and the current rate. Therefore, the Court finds that the only defaults which Lafayette must cure under § 365(b)(1) as a precondition for assuming the lease are the aforementioned rent, real estate tax and roof repair.

*Cure and Adequate Assurance*

The debtor has satisfied the Court that it is willing and able to promptly cure the existing defaults. The costs that Lafayette will have to bear in curing the defaults are relatively minor, considering its current income from the sublease rent and its income from other sources.

Since the landlord has demonstrated no pecuniary loss arising out of any of the defaults, the only remaining requirement of

§ 365(b) which need be considered is that of "adequate assurance of future performance." § 365(b)(1)(C).

Because the premises in question are located in a shopping center, special considerations apply. *See*, H.R. No. 95–595, *supra*, at 348–49. In recognition of the particular vulnerability of the interests of the shopping center landlord, and in order to make certain that he is receiving substantially what he bargained for, the Code expressly defines the parameters of "adequate assurance" in the shopping center context:

... adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease will not breach substantially any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt substantially any tenant mix or balance in such shopping center.

§ 365(b)(3).

The debtor has presented a twofold assurance of rent and other monetary payments due under the lease. First, Lafayette tenders its own renewed viability as evidence that the requirements of the lease will be met. While the debtor has in the past had severe business losses from its radio electronics operations, it has substantially scaled down its retail operations and has profitably sublet the locations of many of its former stores, which leases were duly assumed. Moreover, it is on the eve of consummating a merger agreement and proffering a plan of arrangement to its creditors. The sublease here in question provided for $9,960.00 per annum over and above the rent obligation of the main lease.

It is anticipated, according to the uncontradicted evidence, that a substantial "stream of income" will be generated by the subletting of the eighty to ninety Lafayette locations whose leases either have already been or are currently sought to be assumed. While the Lafayette plan faces many contingencies, not the least of which is court authorization for its future lease assumptions, it is nevertheless clear that sufficient income will be forthcoming from the leases already assumed to support Lafayette's contention that it will be able to meet the monetary obligations under the lease in question. It should also be noted that Lafayette currently holds a security deposit in the amount of $5,280.00 from the subtenant which may be used to defray any costs it might encounter.

The second fold of Lafayette's assurance is that the subtenant of the premises sought to be assumed is in a financially sound position. A personal financial statement in evidence indicates that one of the individuals who comprise the unincorporated subtenant, James Kavanagh, has a personal net worth far in excess of the rental obligation. Since the sublease expires on July 30, 1985, and the main lease expires on July 31, 1984 (subject to two five year options to renew), the period of rent obligation under the main lease is entirely covered by the term of the sublease. In light of the subtenant's substantial investment in the premises, there is no reason to believe that the subtenant will not take advantage of its option to renew the sublease. Thus, there appears to be no reasonable cause to believe that rent payments under the main lease will not be duly made.

Since the lease in question provides for no "percentage rent," subsection "B" of § 365(b)(3) is inapplicable. Moreover, the landlord has not alleged that assumption will breach a provision of any other lease relating to the shopping center or that it will upset the existing tenant mix. Therefore, subsections "C" and "D," respectively, of § 365 are also inapplicable. Having satisfied the Court that future rent and other consideration will be forthcoming in accord-

ance with the terms of the lease, Lafayette has met the requirement of "adequate assurance" under § 365.

*Conclusion*

The lease in question, standing alone, is not essential for Lafayette's revitalization, but its assumption in the aggregate is a vital step on the road to financial recovery. The landlord is not prejudiced by assumption, since it is being made whole by the curing of the existing defaults and the adequate assurance given under § 365(b)(3). Since the bankruptcy clause in the lease is nullified for the purposes herein, it is ineffective to preempt the assumption.

The Court, therefore, holds that Lafayette is authorized to assume the lease and to cure the defaults which now exist.

Settle order.