**ROGUE VALLEY STATIONS, INC., Plaintiff,**

v.

**BIRK OIL COMPANY, INC., an Oregon Corporation, Shell Oil Company, a Delaware corporation, and William C. Cornitius, Inc., a California corporation, Defendants.**

**Civ. No. 83–199–PA.**

United States District Court, D. Oregon.

July 15, 1983.

---

Mark A. LaMantia, David S. Shannon, Shannon, Johnson & Kromer, P.C., Portland, Or., Stuart Foster, Foster & Purdy, Medford, Or., for plaintiff.

John D. Burns, William N. Mehlhaf, Burns & Mehlhaf, Portland, Or., J.M. Esquivel, Houston, Tex., for defendant Shell Oil Co.

Carl M. Brophy, Douglass H. Schmor, Brophy, Wilson & Duhaime, Medford, Or., for defendant William C. Cornitius, Inc.

## OPINION

PANNER, District Judge.

Plaintiff Rogue Valley Stations, Inc. ("Rogue Valley") brings this action against three defendants: Birk Oil Company, Inc. ("Birk"), Shell Oil Company ("Shell"), and William C. Cornitius, Inc. ("Cornitius"). Plaintiff is a "jobber-dealer," that is, a retailer of gasoline, leasing a service station at 2001 Biddle Road, Medford, Oregon. Defendants Birk and Cornitius are or have been "jobbers," that is, distributors of gasoline purchased from a refiner, and have supplied plaintiff. Shell is a refiner of gasoline and has sold to Birk and Cornitius. Plaintiff's immediate objective is to restrain Shell from taking possession of the Biddle Road station. At its heart, this case poses the question whether the notice and termination requirements of the Petroleum Marketing Practices Act, Pub.L. No. 95–297, 92 Stat. 322 (1978), 15 U.S.C. §§ 2801–41, apply to a refiner who has never had a franchise relationship with a retailer. I conclude the Act does not apply, and find for the defendants.

## PROCEDURAL BACKGROUND

On February 8, 1983, Rogue Valley filed a complaint for injunction under the PMPA against Birk and Shell together with a motion for temporary restraining order and

order to show cause. Plaintiff's action was prompted by Shell's filing of complaint for forcible entry and detainer against it in District Court in Jackson County, Oregon. On February 11, 1983, Shell filed a motion to dismiss. On February 14, 1983, I heard the motions and temporarily enjoined Shell from attempting to retake possession of the subject premises pending an expedited trial. Pursuant to the parties' stipulation and my order, the hearing on plaintiff's motion for preliminary injunction was consolidated with the trial of the liability issue on the merits. The damages issue was separated for subsequent trial. On March 7, 1983, Rogue Valley filed its first amended complaint and named Cornitius as a party defendant. The matter was tried to the court on April 20–22, 1983.

### PMPA OVERVIEW

Subchapter I of the Petroleum Marketing Practices Act, titled "Franchise Protection," 15 U.S.C. §§ 2801–06, sets minimum federal standards for the termination or nonrenewal of franchise relationships for the sale of motor fuel.

> The Act is a complex piece of legislation which creates a new concept called a "franchise relationship," that is, an entity separate from, but defined by, the "franchise," or contractual arrangements existing between the parties. The Act then prohibits a franchisor from either terminating a franchisee or failing to renew a franchise relationship, except under carefully defined conditions, and then, only for the specific grounds permitted by the Act.

*Frisard v. Texaco, Inc.,* 460 F.Supp. 1094, 1097 (E.D.La.1978).

■ The primary purpose of the Act is to protect petroleum franchisees from overbearing and discriminatory termination practices by franchisors. *Gilderhus v. Amoco Oil Co.,* 470 F.Supp. 1302, 1303 (D.Minn, 1979); S.Rep. No. 731, 95th Cong., 2d Sess. 41, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 887. "The Act does not provide a franchisee with total protection against termination but only with protection against unreasonable or arbitrary termination." *Humboldt Oil Co. Inc., v. Exxon Co.,* 695 F.2d 386, 389 (9th Cir.1982).[1]

As was recently noted,

> [t]he statutory scheme of the PMPA seeks to strike a balance between the interests of the participants in a petroleum marketing franchise relationship. Congress recognized the disparity of bargaining power between franchisor and franchisee and the harsh consequences of suddenly terminating a business for which the franchisee has worked long and hard to develop goodwill. *See* 123 Cong. Rec. 10386 (1977) (remarks of Rep. Mikva). Echoing those concerns, the PMPA commits gasoline franchisors to a franchise marriage of sorts, the dissolution of which is available only on specific grounds. While most of the grounds relate to serious franchisee misconduct, others reflect an intent to permit the franchisor to exercise reasonable business judgment.... [T]he one thing the Act is clearly intended to prevent is the appropriation of hard-earned goodwill which occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern. *See* 123 Cong.Rec. 10385 (remarks of Rep. Conte); *id.* at 10386 (remarks of Rep. Mikva).

*Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1220 (7th Cir.1982). *See Brown v. American Petrofina Marketing, Inc.,* 555 F.Supp. 1327, 1330–31 (M.D.Fla.1983). With this policy in mind, Congress prohibited franchisors from

---

1. Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.
*Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 (7th Cir.1982) (citing S.Rep. No. 731, *supra,* at 17–19, *reprinted in* 1978 U.S.Code Cong. & Ad. News at 875–77).

terminating or failing to renew franchise agreements, see 15 U.S.C. § 2802(a), except for certain reasons specified in the Act, see id. at §§ 2802(b), 2803, and upon proper notice to the franchisee, see id. at § 2804.

## ISSUE SUMMARY

Refiner (Shell) controls premises (2001 Biddle Road) on which it constructs a service station. Refiner leases the station to a jobber (Cornitius, later replaced by Birk). Jobber subleases the station to a jobber-dealer, that is, retailer (Rogue Valley). Jobber (Birk) files for bankruptcy. Refiner acts to evict retailer. Does retailer have recourse under the Act?

## PARTIES

Rogue Valley is an Oregon corporation in good standing and has operated a Shell branded service station in Medford, Oregon, since January, 1978.

Birk is an Oregon corporation which operated as a Shell jobber in the Medford area beginning on December 15, 1980. Birk has not made an appearance in this litigation. Birk filed a bankruptcy petition prior to commencement of this case. On February 10, 1983, its bankruptcy counsel indicated to this court that Birk did not intend to appear in this proceeding. (Letter, exhibit 129).

Shell is a Delaware corporation with its principal place of business in Houston, Texas. Shell refines motor fuel. It is qualified to do and is doing business in Oregon.

Cornitius is a California corporation doing business in Oregon. From about 1972 to December 15, 1980, Cornitius operated as a Shell jobber in the Medford area.

## BASIC FACTS

The material factual findings I made at trial will be specified in the "Discussion." The parties stipulated to the following facts.

On November 30, 1967, Shell entered into a lease of unimproved real property at 2001 Biddle Road, Medford, Oregon, with the owners thereof, Alton M. and Agnes L. Anderson. Thereafter, Shell constructed a conventional two-bay ranch-style service station for the retail sale of gasoline and other related petroleum products and accessories. The lease, as amended December 12, 1968, provided for an initial term of May 17, 1968 to October 17, 1983, and included optional extensions of five years each (exhibits 101–105).

After completion of construction in 1968, Shell directly delivered petroleum products to its branded stations in the Medford area, including the Biddle Road station, through a Shell distributor who operated on a commission basis. Beginning in 1971, the distributor was Cornitius. Sometime later, apparently in 1972, Cornitius was converted from a Shell distributor to a Shell branded jobber, who purchased motor fuel from Shell for resale. Shell and Cornitius also entered into a separate Jobber Lease (sublease) of the Biddle Road property (exhibits 38/109), which has since been operated as a Shell branded station. In the July 1, 1980 Shell-Cornitius Jobber Lease (exhibits 12/110), paragraph seven states that Cornitius shall not assign the lease without Shell's prior written consent.

On January 1, 1978, Cornitius and Rogue Valley entered into a Dealer Lease (exhibits 37/107) and Dealer Agreement (exhibits 37/108) by virtue of which Rogue Valley undertook the operation of the Biddle Road station as the dealer. The Dealer Lease and Dealer Agreement each had terms of January 1, 1978 to June 30, 1981.

Prior to the termination of these contracts, however, Cornitius sold its Shell jobbership and certain of its assets to Birk (exhibits 152–165). After an initial one-year Jobber Lease (sublease) of the subject premises (exhibits 10/117), Shell and Birk entered into a subsequent Jobber Lease of the Biddle Road station (exhibit 118). The lease provided that its term "shall be a primary period beginning on December 15, 1981 and ending on December 14, 1982."

On September 30, 1981, Birk and Rogue Valley entered into a Dealer Lease Agreement (exhibits 41/120) and Dealer Product Sales Agreement (exhibit 121). The term of these contracts was from July 1, 1981 to

June 30, 1986. Pursuant to the contracts, Rogue Valley continued to operate the Biddle Road station as the dealer.

On January 21, 1983, John Biladeau, Shell's Northwest District manager, met with Maynard Hadley and Frank Adler, Rogue Valley's president and vice-president respectively, and advised them that Birk's underlying lease with Shell had expired on December 14, 1982. He indicated that Shell wished Rogue Valley to vacate the premises. (Shell has decided not to extend Birk's jobbership and lease because of the serious financial difficulties Birk was experiencing.) On February 7, 1983, *Shell* filed against *Rogue Valley* in state court a forcible entry and unlawful detainer action.

## DISCUSSION

Plaintiff has filed six claims for relief: franchisor-franchisee relationship, third party beneficiary, assignment of franchise, conspiracy, promissory estoppel, and duty to deal in good faith.

*I. Franchisor-Franchisee Relationship.*

■ Plaintiff's first theory is a straightforward contention that Rogue Valley and Shell have a franchise relationship under the PMPA. Whether this is so depends on the language of the Act. "[I]n any case concerning the interpretation of a statute the 'starting point' must be the language of the statute itself." *Lewis v. United States,* 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).[2]

The PMPA defines the term "franchise" as follows:

As used in this subchapter:

(1)(A) the term "franchise" means any contract—

(i) between a refiner and a distributor,

(ii) between a refiner and a retailer,

(iii) between a distributor and another distributor, or

(iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

(B) the term "franchise" includes—

(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—

(I) under a trademark owned or controlled by a refiner ... and

(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law ....

15 U.S.C. § 2801(1). The PMPA defines the term "franchise relationship" as follows:

(2) The term "franchise relationship" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee

---

**2.** It is a well-established rule that "when words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by consideration drawn ... from any extraneous source." *Caminetti v. United States,* 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917).

which result from the marketing of motor fuel under a franchise.

*Id.* at § 2801(2). The PMPA defines the term "franchisor" as follows:

> (3) The term "franchisor" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*Id.* at § 2801(3). The PMPA defines the term "franchisee" as follows:

> (4) The term "franchisee" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*Id.* at § 2801(4). The PMPA defines the term "contract" as follows:

> (10) The term "contract" means any oral or written agreement. . . .

*Id.* at § 2801(10).

The PMPA applies to four types of franchise, *id.* at § 2801(1)(A), only one of which is applicable here: refiner/retailer, *id.* at § 2801(1)(A)(ii). Whether Rogue Valley and Shell have a "franchise relationship" the Act will protect depends on whether they have mutual obligations and responsibilities which have arisen "under a franchise." *Id.* at § 2801(2). The statutory definition "recognizes that the 'franchise relationship' extends beyond the bare bones of a contract or franchise agreement." Comment, *Retail Gasoline Franchise Terminations and Nonrenewals Under Title I of the Petroleum Marketing Practices Act,* 1980 Duke L.J. 522, 531. "The concept of a franchise relationship is an important one

. . . because it is defined and treated under the PMPA[ ] as an entity separate from the franchise, or contract." *Frisard, supra,* 460 F.Supp. at 1098.

The Act applies to specified aspects of the branded dealer's relationship with his supplier. For example, the term "franchise" includes any contract for the distributor of branded motor fuel and any lease of marketing premises for such distribution. The term "franchise relationship" more broadly covers the fuel marketing obligations and responsibilities of the franchisor and franchisee regardless of whether these responsibilities are specified in a current contract. The significance of the definition of "franchise relationship" is twofold: it makes clear that the Act's protections apply even upon expiration of a current contract, and it signifies that it is the franchise relationship, as distinguished from the specific terms of a prior contract, that the franchisor must renew.

Finch, *Judicial Interpretation of the Petroleum Marketing Practices Act: Strict Construction of Remedial Legislation,* 37 Bus. Law. 141, 143 (1981) (footnotes omitted).[3]

■ Before a "franchise relationship" which is susceptible to court-ordered renewal can be created, there must first have been a "franchise." 15 U.S.C. § 2801(2). A "franchise" results only if there is a "contract" between the parties. *Id.* at § 2801(1). The contract can be for either "distribution of motor fuel," *id.* at § 2801(1)(A), or occupation of "leased marketing premises," *id.* at § 2801(1)(B)(i). "[A]ny oral or written agreement" between the parties can constitute a contract; it need not be in writing. *Id.* at § 2801(10).[4]

---

**3.** In connection with the non-renewal provisions of the title, the term "franchise relationship" is utilized. The term is defined to cover the broad relationship which exists between a franchisor and a franchisee by reason of the franchise relationship. . . . [I]n the renewal context, the contract which constitutes the franchise may no longer exist and the term "franchise relationship" is utilized to avoid any contention that because the "franchise" does not exist there is nothing to renew.

Explanation of the Major Provisions of the Bill, p. 20 (92 Stat. 1666), quoted in *Frisard, supra,* 460 F.Supp. at 1098 n. 1.

**4.** [I]t is necessary that the practitioner in this area examine fully not only the writings in existence between any two parties which may comprise a petroleum franchise but also the actual practices of those parties as well. Farrell, *Franchising in Connecticut—"Can Anybody Here Play This Game?",* 51 Conn.B.J. 446, 463 (1980).

■ The plaintiff bears the burden of establishing the existence of a franchise relationship, and then its termination or nonrenewal. *Id.* at § 2805(c). *See Trigg v. Texaco, Inc.,* 511 F.Supp. 447, 449 (S.D.Tex. 1981). If plaintiff succeeds, the franchisor then has the burden of establishing as an affirmative defense that such termination or nonrenewal was permitted by the Act. 15 U.S.C. § 2805(c).

A district court in Florida recently applied the statutory definitions to a situation similar to that here. *See Brown, supra,* 555 F.Supp. 1327. In that case, four gasoline retailers brought suit for wrongful termination of their franchises. One of the defendants, Fina, a refiner, owned or leased the property upon which the dealers' stations were located. For a number of years, Fina had leased those properties to Clay Oil Corporation, a distributor. Clay, in turn, leased the stations to the four plaintiff dealers who operated them as Fina-branded retail gas stations. In June, 1982, Fina notified Clay that it would not renew the leases for the four stations beyond their expiration dates later that year. Shortly thereafter, Clay notified the plaintiffs of Fina's decision. Plaintiffs brought an action and the court stated:

> Fina's position is basic. It points out that the PMPA regulates franchise relationships between a franchisor and a franchisee and that central to such a relationship is the existence of a contractual agreement between the parties. Fina notes the uncontradicted evidence that no contract has ever existed between it and any of the plaintiffs. Thus, Fina maintains that the PMPA is inapplicable to its relationship with any of the four plaintiffs.

*Id.* at 1331. The court agreed that there was no franchise relationship. It noted that "the evidence could not be any clearer" that there was no oral or written contract pertaining to the sale or distribution of motor fuel.

> Fina's dealings in this matter were exclusively with Clay. All four plaintiffs read-

ily conceded that they had never entered into any form of agreement with Fina— either oral or written. . . .

*Id.* at 1332.

■ Likewise, the evidence here is undisputed that there have been no express contracts, either oral or written, between Rogue Valley and Shell relating either to distribution of motor fuel or occupation of the leased premises on Biddle Road. Shell took great pains to insure its distributor, Birk, was the party responsible. The Shell-Birk Jobber Contract (exhibits 9/112), which imposes at paragraph thirteen a set of specific standards regarding the operation of Birk's retail outlets, including the Biddle Road station, is totally a requirement imposed on Birk, not on Rogue Valley. Shell's supply of gasoline to plaintiff's distributor does not make the Shell-Rogue Valley relationship a "franchise relationship" under the Act.

Plaintiff argues that a "franchise relationship" can grow out of a contractual relationship which is implied rather than express. The Act does not so contemplate. Congress defined "franchise" to include each of the possible relationships of refiner/distributor, refiner/retailer, distributor/distributor, and distributor/retailer, when a contract exists between the parties. 15 U.S.C. § 2801(1)(A). Although Congress broadly defined "contract," *id.* at § 2801(10), it did not intend that a retailer who is supplied by a distributor could bring an action against a refiner with whom the retailer has no relationship except ultimately receiving motor fuel. If it did so intend, Congress would not have specified the four possible combinations and defined a "franchise" to exist between parties only where there is a written or oral agreement.

Even if an unusual situation could present a colorable claim of an implied contract giving rise to a franchise relationship, *cf. Lasko v. Consumers Petroleum of Connecticut, Inc.,* 547 F.Supp. 211 (D.Conn. 1981),[5] I find insufficient evidence here that

---

5. *Lasko* illustrates the broad reading a court may give the PMPA to effectuate its purposes.

an implied contract existed. Plaintiff contends such a contract arose because of circumstances following Birk's cessation of delivery of petroleum supplies in the winter of 1982–83. During the interim period leading up to issuance of this opinion, plaintiff has been receiving its gasoline from Fields and Ensley, a Shell distributor in the Roseburg area. Plaintiff contends that Shell knowingly created a franchise relationship with it by specifically allowing Fields and Ensley to supply plaintiff. Plaintiff states that Shell made an "imprinter card" by which Rogue Valley could purchase gasoline from Fields and Ensley. Shell's witnesses testified that Shell produces imprinter cards at the request of its distributors. I accept this testimony. If Fields and Ensley decided to supply Rogue Valley, that was its decision and when Shell supplied an imprinter card, Shell simply relied on Fields and Ensley's credit. *See Trigg, supra,* 511 F.Supp. at 449 (permission to accept credit cards and use invoices from credit sales to facilitate the wholesale purchase of petroleum products did not create a franchise relationship between a refiner and distributor/retailer); Finch, *supra,* 37 Bus.Law. at 143.

I find that there has been no contract between plaintiff and Shell. Accordingly, I conclude that there was no "franchise" between the parties and thus no "franchise relationship." *Cf. Checkrite Petroleum, Inc. v. Amoco Oil Company,* 678 F.2d 5, 10 (2nd Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982) (the plain terms of the PMPA do not provide protection to a non-franchisee and "the legislative history of the act expresses no congressional intent to go beyond these plain terms."); *Johnson v. Mobil Oil Corp.,* 553 F.Supp. 195 (S.D.N.Y.1982) (PMPA inapplicable where plaintiff an employee of refiner rather than a franchisee). I therefore DENY plaintiff's first claim for relief.

*II. Third Party Beneficiary.*

Plaintiff's second theory is that it is the intended beneficiary of the franchise agreement between Shell and Birk for occupation of the "leased marketing premises" at Biddle Road. Plaintiff argues Shell failed to give Birk notice of nonrenewal as required by 15 U.S.C. § 2804, and that Shell had no cause under § 2802(b) for its failure to renew. Plaintiff contends it is entitled to enforce Birk's rights under the Act because the Shell-Birk Jobber Lease (exhibit 118) had as its purpose the selling of motor fuel from the Biddle Road station. This argument presents a close question.

The PMPA generally prohibits termination or nonrenewal of a franchise relationship except as provided in 15 U.S.C. § 2802(b). *See id.* at § 2802(a). One of five classes of exceptions to the prohibition is that a franchisor may terminate or not renew a franchise relationship upon the occurrence of certain events relevant to the relationship and as a result of which termination or nonrenewal is reasonable. *Id.* at § 2802(b)(2)(C). These events, listed in § 2802(c), are "commercial reasons why a franchisor would be justified in terminating [or not renewing] a franchise." *Humboldt, supra,* 695 F.2d at 388. Included as relevant events are "failure by the franchisee

---

There the service station premises were owned by a jobber and leased to a retailer, but the refiner supplied the retailer directly. The court stated its belief

> that Congress, in defining "franchise," focused its attention on the usual three-party chain of authorization—that is, a refiner who supplies petroleum to a distributor and authorizes the use of its trademark by such distributor, who in turn sells the product to a tenant retailer and authorizes the retailer to use the refiner's trademark.... It is the party who controls what trademark the retailer uses that Congress was concerned with, not necessarily the party who supplies the petroleum.

*Id.* at 219. The court found that the jobber controlled the trademark used by the retailer and concluded that the jobber was a franchisor within the Act. In doing so the court noted that "[u]nder a literal reading of the statute, a franchise could be said to exist between a retailer and a distributor of gasoline only if an oil refiner, whose trademark is being authorized for use, actually *supplies* motor fuel to the authorizing distributor." *Id.* (emphasis in original). But the court concluded that "there is no reason to suppose that Congress meant to exclude the somewhat unusual case" presented there. *Id.*

to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled," 15 U.S.C. § 2802(c)(8), and "failure by the franchisee to operate the marketing premises for—(A) 7 consecutive days," *id.* at § 2802(c)(9).

Prior to and during the late summer and early fall of 1982, Birk was experiencing financial difficulties. In mid-fall, 1982, Stan Loney, a Shell jobber representative, was instructed by John Biladeau, Shell's Northwest District Manager, to prepare jobber contracts and other documents to replace Birk with Cornitius as the Medford-area jobber. Birk owed a substantial debt to Cornitius as a result of the 1980 Cornitius-Birk transfer and had not been making all of the required payments to Cornitius. Although William C. Cornitius, president of Cornitius, signed a jobber contract and associated documents on November 11, 1982, the transfer back from Birk to Cornitius was not effectuated at that time because he and Richard Birkinshaw, president of Birk, could not come to terms.

On January 13, 1983, Shell notified Birk (letter exhibits 15/123) that it intended to terminate the Shell-Birk Jobber Contract (exhibits 9/112) effective April 25, 1983. Shell's notice specified both failure to pay and failure to operate for more than seven consecutive days as grounds for termination of the Jobber Contract.

On February 9, 1983, Shell supplemented its January 13, 1983, notification of termination of the Jobber Contract with a letter specifying Birk's filing for bankruptcy as an additional ground for termination under the Act (exhibits 16/126). Birk filed for bankruptcy on January 7, 1983. The PMPA specifies that "declaration of bankruptcy or judicial determination of insolvency of the franchisee" is another relevant event justifying termination or nonrenewal. *See* 15 U.S.C. § 2802(c)(2). (In its February 9 letter, Shell confirmed that termination of the Jobber Contract would be effective April 25, 1983.)

I find that the January 13 and February 9 notices complied with the Act's requirements for termination of the Shell-Birk Jobber Contract.

The Jobber Contract, however, was not the sole basis for the Shell-Birk franchise relationship. In addition, Shell had leased to Birk the Biddle Road station. This lease also created a franchise relationship. *See id.* at § 2801(1)(B)(i).

> The combined functions of fuel supplier and landlord provide many franchisors a unique opportunity to exercise control over the franchisees. For this reason the Act specifically includes lease arrangements within its definition of "franchise," and thereby regulates the conditions for terminating leaseholds as well as fuel marketing agreements.

Finch, *supra,* 37 Bus.Law. at 155.

On January 18, 1983, Shell notified Birk (letter, exhibits 13/124) that it had failed to pay rent in a timely manner on the Biddle Road station and that Shell was treating the Shell-Birk Jobber Lease (exhibit 118) as terminated. Shell's letter stated:

> We intend to take possession of the premises and will attempt to preserve any assets you may have on the premises for the next 20 days.... Moreover, we are informing your subtenants of the fact that you no longer have any right to occupy the premises and therefore any rights they might have to occupy the premises have also ended.

(Exhibits 13/124.)

On January 26, 1983, Shell notified Rogue Valley (letter, exhibits 14/125) as follows:

> [T]he lease between Shell Oil Company ("Shell") as lessor and Birk Oil Company ("Birk Oil") as lessee for the property located at 2001 Biddle Road in Medford, Oregon (the "Premises") expired by its own terms on December 14, 1982. Any rights you may have had in the Premises through a lease between you and Birk Oil would be subject and subordinate to Shell's lease with Birk Oil. Accordingly, it is Shell's position that you have no leasehold interest in the Premises.

*Id.* Shell demanded that Rogue Valley vacate the premises by January 31, 1983.

Shell based its demand to vacate on the terms of the Birk-Rogue Valley Dealer Lease which provided in paragraph ten:

> If Birk does not own the leased premises, this Lease (a) is subject to all the provisions of the Lease under which it is entitled to possession, and (b) shall terminate automatically upon expiration or any sooner termination by the owner of such Lease.

(Exhibits 41/120.) Shell argues that once the Shell-Birk Jobber Lease expired by its terms on December 14, 1982, Rogue Valley had no rights. Plaintiff argues that Birk was entitled to renewal of its Jobber Lease with Shell notwithstanding the one-year term, and that plaintiff is entitled to assert that right.

It is clear that Shell, in terminating Birk's Jobber Lease for the Biddle Road station, failed to comply with PMPA's notice requirements, 15 U.S.C. § 2804. Shell's January 18 letter was not sent prior to the purported termination date, *see id.* at § 2804(a)(2), nor did it enclose a summary of the Act, as required by § 2804(c)(3)(C). *See Blankenship v. Atlantic Richfield Co.,* 478 F.Supp. 1016 (D.Or.1979) (PMPA's notice requirements strictly construed). *Accord, Daniels v. Dilmar Oil Co.,* 502 F.Supp. 178, 181 (D.S.C.1980); *Davy v. Murphy Oil Co.,* 488 F.Supp. 1013 (W.D.Mich.1980).

 Shell relies simply on the language of the Jobber Lease which provided that it would expire by its terms on December 14,

1982. A franchise relationship does not automatically expire at the end of its term.

Once a statutory franchise relationship is created, the Act operates to perpetuate that relationship unless the franchisor can establish statutory grounds for termination or unless the parties mutually agree to termination. This protection constitutes the heart of the Act. By perpetuating the franchise relationship absent statutory ground for its termination, the Act reflects Congress' consideration that traditional contract law is an inadequate safeguard for the motor fuel franchisee.

Finch, *supra,* 37 Bus.Law. at 144.

Shell also relies on 15 U.S.C. § 2802(c)(4) which includes as a relevant event justifying termination or nonrenewal "loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if the franchisee was notified in writing . . . ." This reliance is misplaced. The provision is directed to expiration or termination of an underlying *ground* lease between franchisor and landowner (here, Shell and the Andersons). *See e.g., Hifai v. Shell Oil Co.,* 704 F.2d 1425 (9th Cir.1983) (termination of franchisee reasonable where underlying ground lease terminated); *Veracka v. Shell Oil Co.,* 655 F.2d 445 (1st Cir.1981) (PMPA not violated where franchisor failed to renew franchise after terminating ground lease in accordance with terms).[6]

---

**6.** Shell's interpretation would create a major loophole in the Act whereby a refiner could lease station premises it owned or controlled to a distributor on a year-to-year or shorter basis; the distributor would sublease to a retailer who would be notified of the so-called "underlying lease"; and then the refiner and distributor could rid themselves of an unwanted tenant/retailer at the expiration of any period of the refiner-distributor lease without compliance with the substantive provisions of the Act. Congress did not intend the Act could be so easily avoided.

Congress was, and courts are, sensitive to "the often vast disparity in bargaining power which exists between franchisors and franchisees." *Lasko, supra,* 547 F.Supp. at 216. As noted *supra,* "[t]he combined functions of fuel supplier and landlord provide many fran-

chisors a unique opportunity to exercise control over their franchisees." Finch, *supra,* 37 Bus.Law. at 155. "Business franchises enjoy an elusive status because they involve aspects of sales, agency, lease, license, trademark, employment, and joint venture." Note, *Constitutional Obstacles to State "Good Cause" Restrictions on Franchise Terminations,* 74 Colum.L.R. 1487, 1488 (1974). In this somewhat nebulous area, courts properly inquire into the *motivations* of parties who terminate franchise relationships. *See* S.Rep. No. 731, 95th Cong., 2d Sess. 43, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 901 ("the legislation leaves to the courts the task of resorting to traditional principles of equity to maximize attainment of the competing statutory objectives.").

Three cases suggesting that a court may properly look into a franchisor's motivations are *Sachi v. Mobil Oil Corp.,* [1980–81 Trade

While I reject Shell's legal theories, I find that Shell and Birk had an "arms-length" relationship; that Shell was not responsible for the circumstances leading to Birk's financial difficulties; that Shell had good cause in those difficulties for not renewing the Shell-Birk Jobber Lease; that Shell's motivation in terminating Birk was not to terminate Rogue Valley; and that Shell's decision to force Rogue Valley to vacate was primarily because Shell did not want a party occupying its premises with whom it did not have nor wish to have a contractual or franchise relationship.

■ As noted, Birk filed for bankruptcy on January 7, 1983. Under Title I of the Bankruptcy Reform Act of 1978 ("Bankruptcy Code"), Pub.L. No. 95–598, 92 Stat. 2549, 11 U.S.C. § 101 *et seq.*, essentially all creditor actions against Birk were automatically stayed upon Birk's bankruptcy filing. 11 U.S.C. § 362(a).[7] The Bankruptcy Code specifically prohibits the enforcement of bankruptcy termination clauses in executory contracts, unexpired leases, or "applicable law." *See id.* at § 365(e)(1). If the trustee is able to assume such a contract or lease, it will not be barred from doing so by the existence of a forfeiture clause. *See, e.g., In re Lafayette Radio Electronics Corp.,* 7 B.R. 189, 191 (Bkrtcy.E.D.N.Y. 1980). *See generally* Casher & Trachtenberg, *Caveat Franchisor: The Interplay of the Bankruptcy Code and the Petroleum Marketing Practices Act,* 87 Comm.L.J. 216, 219–20 (1982). In fact, the automatic stay prevents a franchisor from sending a PMPA notice of termination or nonrenewal without first securing appropriate relief from stay from the Bankruptcy Court. *Id.* at 221–22.

■ Here, Shell did not seek any relief from the Bankruptcy Court. However, on February 22, 1983, Birk's trustee in bankruptcy stated that the Jobber Lease had no value to the estate after December 14, 1982

---

Cases] Trade Reg.Rep. (CCH) ¶ 63,044 at 77,-192 (E.D.N.Y.1979), *Gasper v. Chevron Oil Co.,* 490 F.Supp. 971 (D.N.J.1980), and *Exxon Corp. v. Miro,* 555 F.Supp. 234 (C.D.Cal.1983).

In *Sachi,* the franchisor elected not to exercise an option on the underlying lease and the franchisee sought to enjoin the ensuing termination of his sublease. The court denied plaintiff's request but concluded the franchisor's motivation could make for "a more difficult issue":

Congress plainly did not intend to restrict the prerogative of the franchisor to exercise legitimate, independent business judgment in arriving at a decision not to renew an underlying lease to the franchise premises. If there is an arms-length relationship between the franchisor and the fee owner and a bona fide change in control over the premises, the requirements of the Act have been met. Admittedly, this court might find it a more difficult issue if the franchisor's motivation in failing to exercise the underlying lease were discriminatory, retaliatory or punitive. However, plaintiff has made no such allegation.

*Sachi, supra,* at 77,194–77,195.

In *Gaspar,* the franchisor notified the franchisee of its intention not to renew the underlying lease and encouraged him to negotiate directly with the landlord. The franchisor offered to renew the franchise relationship if the franchisee could negotiate a lease with the landlord. When the franchisee was compelled to pay the additional sum of $12,000 in order to lease the marketing premises directly from the

landlord, he sued the franchisor to recover the money. The court determined the franchisor had acted properly and denied plaintiff's prayer. As did the *Sachi* court, however, the *Gaspar* court noted its decision rested in part on the good faith shown by the franchisor. "There is no suggestion in this matter that defendant was utilizing such circumstances as a subterfuge to terminate plaintiff's franchise." *Gaspar, supra,* 490 F.Supp. at 974.

In *Exxon,* the franchisor's base lease with the landowners was advanced at the landowner's request. The court held that franchisor's resulting nonrenewal with the retailer did not violate the Act where the change in the base lease was not a bad faith attempt to prevent renewal of the franchise relationship. *Exxon, supra,* 555 F.Supp. 234.

*See also* S.Rep. No. 731, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 896: "[I]t is not intended that termination or nonrenewal should be permitted based upon the expiration of a lease which does not evidence the existence of an arms length relationship between the parties...."

As the next paragraph of the opinion reveals, I have inquired into Shell's motivations.

7. *See generally Ferrous v. Jones,* Adv.Pro. 82–389–PA, op. at 5 (D.Or. Feb. 24, 1983): "The Bankruptcy Code is designed to allow debtors time for rehabilitation, free from creditor pressure. The automatic stay, which enjoins most creditor action against a debtor and its property, is the device used to promote this goal."

and that he would claim no interest in it. (Affidavit, exhibit 130.) This rejection effectively waived the notice defect, *supra* at 21, and terminated the stay as to Shell. See Casher & Trachtenberg, *supra*, 87 Comm.L.J. at 231.

The question is whether this set of facts gives rise to contractual rights which Rogue Valley can enforce. Although not named in the contract, a party may have rights as a third party beneficiary. There are three types of third party beneficiaries: donee beneficiaries, creditor beneficiaries, and incidental beneficiaries. *Williams v. Fenix & Scisson, Inc.*, 608 F.2d 1205, 1208 (9th Cir.1979). Only creditor and donee beneficiaries have potential rights under a contract. *Id. Cf. Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 440 n. 13 (9th Cir.1979) (plaintiff was only incidental beneficiary of franchise agreement under federal Automobile Dealers' Day in Court Act and thus his claim for breach of third-party beneficiary contract would fail). Where performance of a promise in a contract will benefit a party other than the promisee, that party is

> a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or a right of the beneficiary against the promisee which has been barred by the Statute of Limitations or by a discharge in bankruptcy . . . .

Restatement of the Law of Contracts § 133, at 151–52, *quoted in Johnston v. The Oregon Bank*, 285 Or. 423, 430, 591 P.2d 746 (1979). *See also Northwest Airlines v. Crosetti Bros.*, 258 Or. 340, 345–46, 483 P.2d 70 (1971). "In a third party beneficiary contract, benefits flow to both the promisee and the third party, and either may sue to enforce the contract." *Pauley v. Spong*, 661 F.2d 6, 10 (2nd Cir.1981).

Whether Rogue Valley has a beneficial interest in the Shell-Birk franchise depends generally on whether there was an intent to benefit Rogue Valley. That intent "is to be gathered from a construction of the contract in the light of all surrounding circumstances showing such an obligation." *Northern Natural Gas Co. v. Grounds*, 666 F.2d 1279, 1287 (10th Cir.1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). I need not decide that question, however, if Shell has a good defense to such a contract.

In a third-party beneficiary contract, promisor (Shell) can generally assert against beneficiary (Rogue Valley) any defense which promisor could assert against promisee (Birk) if promisee were suing on the contract. *See, e.g., United States v. Industrial Crane & Manufacturing Co.*, 492 F.2d 772, 774 (5th Cir.1974); *Wolf v. National Shopmen Pension Fund*, 512 F.Supp. 1182, 1183 (E.D.Pa.1981); *Visor Builders, Inc. v. Devon E. Tranter, Inc.*, 470 F.Supp. 911, 923 (M.D.Pa.1978); *National Benefit Fund v. Presbyterian Hospital*, 448 F.Supp. 136, 138 (S.D.N.Y.1978). Thus, Shell's defense of Birk's failure to pay (15 U.S.C. § 2802(c)(8)) and failure to operate for seven consecutive days (*id.* at § 2802(c)(9)) can be asserted successfully against Rogue Valley.

I DENY plaintiff's second claim for relief.

### III. Assignment of Franchise.

Plaintiff's third theory is that Shell and Cornitius are the successors in interest to Birk and have assumed the role of plaintiff's franchisor.

Plaintiff correctly asserts that Shell participated in and intended to effect the transfer to Cornitius of Birk's interest in its lease and other arrangements. Significant communications were had between the defendants in November, 1982 for that purpose. However, the negotiations, which were primarily between Cornitius and Birk, never bore fruit. No assignment was made. I find that Shell did not become plaintiff's franchisor by virtue of those communications.

Plaintiff had no relationship with Cornitius after the transfer of the jobbership from Cornitius to Birk on October 30,

1980. *See* Cornitius-Birk Purchase and Sale Agreement (exhibits 39/155–157). While Cornitius retained a security interest in the assets it sold, this does not create a continuing obligation to plaintiff. While a distributor may well be unable to relieve itself of obligations owed to a retailer by assignment, I find that in any case plaintiff made a new agreement with Birk which did effectuate such relief for Cornitius. *See* Birk-Rogue Valley Dealer Lease Agreement (exhibits 41/120) and Dealer Product Sales Agreement (exhibits 121/170), dated September 30, 1981. I find that Cornitius did not remain or become plaintiff's franchisor after 1980.

I DENY plaintiff's third claim for relief.

### IV. Conspiracy.

Plaintiff's fourth theory is that the defendants conspired to violate the PMPA by agreeing to arrange the termination of the Birk-Rogue Valley Dealer Lease in derogation of plaintiff's rights under the Act.

The parties acknowledged that, as a result of previous legal actions brought by plaintiff, Cornitius does not want plaintiff as a dealer. Plaintiff contends that all three defendants conspired to see that a transfer of Birk's jobbership to Cornitius could be effectuated without Cornitius being required to continue serving plaintiff.

The plaintiff has failed to prove a conspiracy. I therefore DENY plaintiff's fourth claim for relief.

### V. Promissory Estoppel.

Plaintiff's fifth theory is that Shell, despite its superior knowledge of the circumstances, failed to inform plaintiff of its impending termination and Shell's intent to file the forcible entry and unlawful detainer action. Plaintiff argues Shell was obliged to so inform plaintiff during a January 7, 1983 telephone call placed by plaintiff's office manager to Shell's Northwest District office. Shell, plaintiff contends, advised it to continue to remit rent payments to Birk as usual.

Plaintiff argues that in reliance on Shell's employee's statements, plaintiff failed to take action to protect its interest in the premises, to its detriment, and that Shell should therefore be estopped from terminating plaintiff's franchise.

To establish an estoppel, "a false representation or concealment of material facts must be made, by a person with knowledge, actual or constructive, of the real facts, to a person without such knowledge, with the intention that it shall be acted on by the latter person, and he must so rely and act thereon that he will suffer injury or prejudice by the repudiation or contradiction thereof . . . ." *National State Bank v. Terminal Construction Corp.,* 217 F.Supp. 341, 359 (D.N.J.1963), *aff'd,* 328 F.2d 315 (3rd Cir. 1964). *Di Napoli v. Exxon Corp.,* 549 F.Supp. 449, 453 (D.N.J.1982). *Compare Wesley v. Mobil Oil Corp.,* 513 F.Supp. 227 (E.D.Pa.1981) (preliminary injunction granted where nonrenewal technically allowed by PMPA but franchisor's silence may have misled franchisee) *with Baldauf v. Amoco Oil Company,* 553 F.Supp. 408, 417 (W.D.Mich.1981), *aff'd,* 700 F.2d 326 (6th Cir.1983) (franchisor's past approval of franchisee's operation of auto repair business did not estop franchisor from changing from full service to pumper-type station, when PMPA's requirements otherwise met) *and Wojciechowski v. Amoco Oil Co.,* 483 F.Supp. 109, 115 (E.D.Wis.1980) (promissory estoppel inapplicable where oral promises made prior to written contract).

I find that Shell did not falsely represent material facts nor conceal material facts it had an obligation to reveal. I conclude that Shell did not have a legal obligation to invite plaintiff to tender rent payments to Shell, nor to accept any payments which might have been tendered, nor to inform plaintiff of the impending state action. I therefore DENY plaintiff's fifth claim for relief.

### VI. Duty to Deal in Good Faith.

Plaintiff's sixth and last theory is that as a result of Shell's dominance and control of plaintiff's business premises and practices, including a requirement that plaintiff sell Shell branded gasoline from

the station, Shell had a duty to deal with plaintiff in good faith. Plaintiff alleges Shell breached that duty by failing to apprise plaintiff of the nonrenewal of Birk's Jobber Lease and Shell's intent to file a forcible entry and unlawful detainer action.

I find that Shell did not require that plaintiff sell Shell branded gasoline from the Biddle Road station. While Shell was lessee of the underlying ground lease from the Andersons, and lessor of the Jobber Lease (sublease) to Birk, the Shell-Birk Jobber Contract (exhibits 9/112) left in Birk's control whether Shell or some other brand of gasoline would be sold at the station. Although it is surely unlikely that a jobber such as Birk would have any real option but to require its dealers to market the lessor's products, the decision was legally the jobber's, not the refiner's. Birk controlled the Shell trademark. *See id.,* paragraph seven.

For this reason and for the reasons discussed previously, I find that Shell did not sufficiently control plaintiff's business premises and practices to give rise to a legal duty not to terminate plaintiff.[8] I therefore DENY plaintiff's sixth claim for relief.

## CONCLUSION

Plaintiff has failed to establish the applicability of the Petroleum Marketing Practices Act to the unique facts here. I therefore find for the defendants.

Defendant Cornitius has filed a petition for attorneys fees and requested oral argument. Argument will be scheduled promptly. In the meantime, defendants may supply a form of judgment which shall be effective ten days after I sign it.

This opinion shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.

---

8. Plaintiff's argument "presumes that Congress intended to provide the maximum amount of protection to franchisees without regard to the potential costs to the franchisors. In fact, the legislative history reflects a sensitivity to the legitimate needs of both franchisees and the franchisors." *Munno v. Amoco Oil Co.,* 488 F.Supp. 1114, 1120 (D.Conn.1980) (footnote omitted). "As remedial legislation, the Act must be given a liberal construction consistent with its goal of protecting franchisees.... Nonetheless, the Act must not be interpreted inconsistently with its plain language and outside its logical boundaries." *Humboldt, supra,* 695 F.2d at 389 (citations omitted).